Farrah Pirahanchi Nazemi, Monireh Bozorgi
P.O Box 722541
San Diego 92172
farrah13p@gmail.com
858-829-2161
Self Represented

**FILED**

Jul 19 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/jenniferm        DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Farrah Pirahanchi Nazemi, Monireh Bozorgi,<br><br>              Plaintiff, | Case No.: **'18 CV1641 CAB MDD**<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>**1. RESCISSION – MISTAKE – VOID AGREEMENT;**<br><br>**2. FRAUDULENT INDUCEMENT**<br><br>**3. FRAUDULENT CONCEALMENT**<br><br>**4. INTENTIONAL MISREPRESENTATION;**<br><br>**5. NEGLIGENT MISREPRESNTATION;**<br><br>**6. INJUNCTIVE RELIEF [VIOLATION OF CIV. CODE § 2923.5;**<br><br>**7. INVASION OF CONSTITUTIONAL RIGHT OF PRIVACY;**<br><br>**8. VIOLATION OF BUS. & PROFESSIONS CODE §17200, ET SEQ.;**<br><br>**9. BREACH OF CONTRACT;**<br><br>**10. SLANDER OF TITLE;**<br><br>**11. DECLARATORY RELIEF;**<br><br>**12. PROMISSORY ESTOPPEL;**<br><br>**13. BREACH OF IMPLIED CONVENANT OF GOOD FAITH & FAIR DEALING;**<br><br>**14. INSTITUTIONAL BAD FAITH;**<br><br>**15. WRONGFUL FORECLOSURE** |

- 1 -
PLAINTIFFS' COMPLAINT FOR DAMAGES

| | |
|---|---|
| 1  Plaintiffs, | Unlimited Civil Case |
| 2  v. | **[JURY TRIAL REQUESTED]** |
| 3  <u>WELLS FARGO BANK, N.A.</u>, and **OTHER WELLS** DOES 1 through 50, inclusive, and all | |
| 4  persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the | |
| 5  property described in the complaint adverse to Plaintiff's title, or any cloud on Plaintiff's title | |
| 6  thereto, named as DOES 51-100, inclusive, | |
| 7  Defendants. | |
| 8 | |

## VENUE AND JURISDICTION

Venue is proper in this County according to California Code of Civil Procedure §395(a) because some or all of the Defendants worked in California to achieve the unlawful and tortuous objectives set forth herein, reside in and/or do business in this County and committed the torts and unlawful acts alleged herein in this County.  This Court has jurisdiction over this action under the California Constitution, Article V, §10, because this case is not a cause given by statute to other trial courts. This Court has jurisdiction over the defendants because a substantial portion of the wrongdoing alleged in this Complaint took place in California, the Defendants are authorized to do business in California, Defendants have sufficient minimum contacts with California and/or otherwise intentionally avail themselves of the markets in California through the promotion, marketing, sale, maintenance, and now wrongful exercise of real property rights and foreclosure rights with respect to realty in California, to render the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

- 2 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

**INTRODUCTION**

1.     In recent history, subprime mortgage lending reached epic proportions.  Historically, banks loaned money to homebuyers that they would not recoup until the stream of payments had been made.  In exchange for this money, interest was paid to the lender by the borrower.  The lender's risk of loss was secured by the property of the borrower.  Because the lender was bearing the risk of loss, the lender had motivation to seek reasonable and conservative appraisals of the property.  Within this structure, it was reasonable for the lender to use its own appraisers as the interests and expectations of the lender and borrower were generally aligned.

2.     As part of the many deregulatory acts passed in the 1980's, two Acts were passed that changed the nature of mortgage law; the Depository Institutions Deregulation and Monetary Control Act of 1980 which barred states from limiting mortgage interest rates and the Alternative Mortgage Transaction Parity Act of 1982, which made it possible for lenders to offer multiple types of mortgages. As a result of the above legislation, the country saw a propagation of adjustable-rate mortgages (ARMs), Interest Only mortgages, including those with balloon payments, so-called option-ARM loans which allowed borrowers to make minimum payments which caused principle to increase.

3.     Unlike traditional mortgage lenders that profited gradually as borrowers repaid the loan, subprime lenders made their profit more immediately.  First there were the upfront charges for excessively high closing costs and brokers fees which were anywhere from three thousand dollars ($3000) to over ten thousand dollars ($10,000) depending on the profitability to the lender (and the corresponding inequity to the borrower).  After that the lenders pooled the loans into Residential Mortgage Backed Securities (RMBS) and sold the RMBS to investors recouping their monies within the first few years of the loan.  Whereas an inflated appraisal would have previously meant risk to the lender, now the lenders profited from inflated appraisal and passed the risk to investors.

4.     The purpose of the RMBS was to provide a large supply of money to lenders for originating loans, and to provide investments to bond holders which were expected to be relatively safe. Mortgage loans were turned into securities and sold to investors by Wall Street via a process called securitization which is subject to a series of tax laws know as the Real Estate Mortgage Investment Conduit (REMIC) Act.  The REMIC Act was designed to protect the RMBS as well as the lenders from

- 3 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

bankruptcy. In order to legally achieve the desired "bankruptcy remoteness," two "true sales" of the loans had to occur, in which loans were sold and transferred to the different parties to the securitization. A "true sale" effecting securitization of borrowers' mortgages also required observance of New York State law as well as the express terms of the Pooling and Servicing Agreement (hereafter "PSA") which is a Trust Agreement required to be filed by the parties under penalty of perjury with the United States Securities and Exchange Commission ("SEC"). In addition to the Mortgage Loan Purchase Agreement ("MLPA"), the PSA is the operative securitization document created by the finance and securitization industry to memorialize securitization transactions.

5.     A "True Sale" of the loan was a circumstance whereby one party owned the NOTE and then sold it to another party. An offer would be made, accepted, and compensation given to the "seller" in return for the NOTE. The NOTES would then be transferred, and the DEEDS OF TRUST assigned to the buyers of the NOTE, with a recorded ASSIGNMENT made every step of the way and each NOTE endorsed to the next party by the previous assignee of record.

6.     In order for the TRUSTEE of a Securitized Trust to have a valid and enforceable secured claim against a borrower's property, the TRUSTEE must prove and certify to all parties that, among other things required under the PSA:

    i.  There was a complete and unbroken chain of endorsements and transfers of the NOTE from and to each party to the securitization transaction (which should be from the (A) Mortgage Originator to the (B) Sponsor to the (C) Depositor to the (D) Trust, and that all of these endorsements and transfers were completed prior to the closing date of the Trusts.

    ii. The TRUSTEE of the Securitized Trust had actual physical possession of the NOTE at that point in time, when all endorsements and assignments had been completed.

7.     During the securitization era, banks and the resulting trusts, in the rush to securitize mortgages and sell those to investors, routinely ignored the critical step of obtaining mortgage assignments from the original lenders to the securities companies, to the trusts. Now years later, when companies "servicing" the trusts need to foreclose there are no documents available to document the proper chain of title because none were originally created. As a result, banks are recreating the missing

- 4 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1    documents or "outsourcing" the documents to companies like Lender Processing Services to produce the

2    needed assignments.  This practice was admitted by deposed bank executives such as GMAC's Jeffrey

3    Stephen that admitted in sworn deposition testimony to signing more than five hundred (500) documents

4    a day and up to ten thousand (10,000) documents a month related to foreclosures without reviewing

5    them.  Due to the strict timelines and guidelines to complete a foreclosure, banks are also fabricating

6    other documents to comply with California's foreclosure guidelines.  The impact of these allegations is

7    so cogent that Old Republic National Title Company will no longer insure the title on homes foreclosed

8    by JPMorgan Chase or GMAC, Mortgage LLC. As further proof of the unlawful business practices,

9    other state legislatures have taken steps to make the process more transparent (see Arizona State Senate

10    Bill 1259, requiring non-originating foreclosure lenders t produce a full chain of title to verify

      ownership).[1]

11         8.     Other states have taken the lead to void foreclosure sales by parties that lack standing.

12    *See, e.g., U.S. Bank Nat. Ass'n v. Ibanez (2011) 941 N.E.2d 40.*  An Alabama circuit recognized the

13    legal ramifications regarding the failure of banks and their trustees to properly transfer NOTES and

14    DEEDS OF TRUST. In *Phyllis Horace v. La Salle Bank National Association, Et Al, 57-cv-2008-*

15    *00362.00,* the Alabama Circuit Court not only sided with the homeowner on this exact issue, but the

16    court issued an order permanently enjoining the defendant trust, LaSalle Bank National Association,

17    from foreclosing on the plaintiff's house because LaSalle failed under New York law and its own PSA

18    to properly transfer the Plaintiff's mortgage NOTE on the plaintiff's home.

19         9.     Because the RMBS were subject to federal regulations that were, for the most part, not

20    observed by lenders, most sales to the RMBS were not valid and enforceable "true sales," and the

21    RMBS did not retain a perfected security interest in the subject property.  In cases such as these, the

22    alleged holder of the NOTE/ beneficiary cannot be the beneficiary of the DEED OF TRUST since the

23    alleged beneficiary does not have the requisite title, perfected security interest, or standing to proceed.

      Through the so-called "securitization process" NOTES and DEEDS OF TRUST were converted from a

24

25

26    [1]  http://www.azleg.gov/documentsforbill.asp?bill_number=sb1259&session_id=102

27    **PLAINTIFFS' COMPLAINT FOR DAMAGES**

non-liquid thirty (30) year mortgage to immediately liquid certificates, bonds, and/or stock with concurrent tax benefits.

10.     Mortgage loans that were securitized became subject to a PSA that was then registered with the SEC as a REMIC Trust, also referred to as a "Special Purpose Vehicle" for tax emption purposes.  The investment banks that pool loans into securitized trusts seek to operate without the hindrance of banking regulations and to avoid liability and tax issues and increase profits by selling mortgages to investors in the form of securities.

11.     Internal Revenue Code §860D(b)(1) states that once an entity elects to be treated as a REMIC it retains that status permanently.  "Double Dipping" occurs when a bank converts a mortgage into a security (unsecured debt) and receives the concurrent tax benefits of a REMIC and *then* attempts to also claim that it exists as a mortgage (secured debt).  "Double Dipping" amounts to tax and securities fraud.

12.     The securitization process converted holders in due course into owners of the right to collect contract payments without holding any legal or equitable interest in any of the securitized mortgages, stocks, bonds, or other derivatives.  These stock holders are insured against default and therefore have not realized any loss or damages resulting from a purported default.  Because the structure of securitization provided insurance to pay the monthly cash flow to the investor in the event of a default, there is no investor or holder in due course that can claim damage by a particular mortgage that is in default.  Also because there is no perfected security interest, the alleged beneficiary is not the real party in interest with regard to any action against the subject property. The securitization process severed the authority of the holders in due course to take steps to avoid losses and the right of foreclosure.  A non-beneficiary cannot direct a servicer to foreclose.

13.     The ability to sell loans to an RMBS allowed lenders to recoup their investment almost immediately, but it was also an incentive to over-appraise property values since the larger the loan issued the more money was made.  Unlike the traditional lender (usually a bank) that had an interest in a conservative appraisal, these new banking standards gave the lender an incentive to inflate appraisals since a higher appraised value meant the bank could package up mortgages with a larger stream of income due and larger streams of income were more valuable to investors.  This system reaped higher

- 6 -

(immediate) profits for the lender while the investor absorbed the (long-term) risk. Because of this, lenders had an incentive to issue bigger loans without regard for underwriting standards and brokers were encouraged by financial incentive to submit inflated appraisals that were rubber-stamped by the lender. These appraisals were cursory looks at the outside of a property or were based solely on published comparable sales.

14.     Because the lenders offered high fees at loan origination to motivate brokers to write big loans this also incentivized predatory lending. Brokers encouraged homeowners (or prospective homeowners) to borrow as much as possible regardless of income or ability to pay. Brokers working directly for the lenders, as well as those working as agents, responded to these incentives with various deceptive, fraudulent, and predatory practices.

    i.   Defendants fraudulently induced the Plaintiffs to enter into, re-finance and stay in mortgages for which they did not qualify or belong;

    ii.   Defendants, and Defendant's predecessors in interest, issued "Pick-a-Pay" loans that were negative amortization loans that allowed borrowers to make minimum payments that did not cover the interest owed. The interest not paid was added to the principal owed on the loans. As such, it is arguable that these loans were not negotiable instruments.

    iii.   Brokers did not alert borrowers that making minimum payments on a "Pick-a-Pay" loan would increase the principle owed, thereby increasing the borrowers minimum payment, thereby eventually making it too costly for them to afford.

    iv.   Brokers told borrowers they could refinance again in one (1) year or two (2) when refinancing at the inflated appraisal value would have been *immediately* impossible.

    v.   Brokers told borrowers that they were "qualified" knowing that borrowers believed "qualified" to mean their loan (and they) had passed underwriting standards.

    vi.   Brokers used various techniques, including switching loan documents, to insure that borrowers did not learn the true nature of their loan until they no longer had a power to rescind.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

15.     Typically, a borrower would enter into a mortgage with WELLS FARGO (or any other Defendant) with a regular income sufficient to cover the initial payments and an A-1 credit rating. Despite this, borrowers were placed into a subprime mortgage with a very high interest rate. When the borrowers signed the loans, they were promised a refinance and that they would get a better loan after a few years of timely payments, but then when the time for refinance came, the borrowers were told they did not qualify and some were literally laughed at.

16.     The spectrum of borrowers deceived by these practices goes from those borrowing one-hundred-thousand dollars ($100,000) to those borrowing over a million ($1,000,000) as represented in this complaint. While there were the occasional no down-payment loans, many borrowers put down cash deposits to purchase their property and these deposits often represented the borrower's life savings. The damage to borrowers caused by these inflated appraisals was that borrowers were induced to sacrifice their investment and equity and thereby suffered huge financial loss. This happened (and is still happening) on a massive scale.

17.     The fraudulent acts of Defendants and other lenders in providing false and inflated appraisals have caused property owners nationwide to suffer. The ripple effect of these inflated appraisals caused property values to rise nationwide in a way that skewed the housing market and affected all residential borrowers. The entire residential real estate market has been affected and millions of consumers have been harmed.

18.     Mortgage Electronic Systems ("MERS") has also been utilized in furtherance of Defendants' scheme by enabling Lenders to avoid NOTICE and recording statutes and further keep borrowers confused about their loans. MERS' charter limits its powers and duties to functioning as an electronic registry of certain types of securities designed to track servicing rights and the ownership of mortgages and provide a convenient central source of information for lenders to track mortgage loans when a loan is transferred among MERS members. MERS purports to simplify the process of SUBSTITUTIONS and ASSIGNS for lenders, investors, and servicers, but the actual result is a diminishing of the rights of consumers/ borrowers. MERS purports to lower costs for lenders (and consumers) by eliminating the need to file ASSIGNMENTS and re-record liens in the county land records, but the actual result is a reduction in county recording revenues from real estate transfers

- 8 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

(which arguably does not benefit us as citizens) and, more importantly, a denial of statutory NOTICE to borrowers. MERS makes it convenient for lenders, investors, and loan servicers (insiders) to retain access to information regarding the true beneficiary while the borrower/ consumer (outsider) is denied that same information. MERS is either the named "beneficiary" or the "nominee" for the lender on the majority of borrowers DEEDS OF TRUST. MERS is the claimed "owner" of the security interest as indicated by the vast majority of the DEEDS OF TRUST assigned, transferred, and recorded in the country's county land records. The effect of this has been to deny proper legal NOTICE to borrowers.

19.    Based upon published reports, including the MERS website MERS is not a lender. MERS does not:

      i.   take applications for, underwrite, or negotiate mortgage loans;

      ii.   make or originate mortgage loans to consumers;

      iii.   extend credit to consumers;

      iv.   service mortgage loans; or

      v.   invest in mortgage loans.

20.    The confusion created by MERS makes it difficult for borrowers to know who holds their NOTE and puts at issue whether any party holds it at all. Pursuant to California law, to perfect the transfer of mortgage paper as collateral, the owner should physically deliver the NOTE to the transferee. Without physical transfer, the sale of the NOTE is invalid as a fraudulent conveyance, or as unperfected. Any attempt to transfer the beneficial interest of a DEED OF TRUST without actual ownership of the underlying NOTE is void under law and MERS does not receive the NOTE and therefore MERS cannot transfer an interest in real property and cannot recover anything from borrowers through legal action.

21.    Beginning in 2008 with TARP,[2] Defendants have accepted billions of dollars from the U.S. taxpayer to implement programs to help homeowners and preserve home ownership in the country. During this time Defendants have continued their predatory practices, now via the loan modification

---

[2] Troubled Asset Relief Program is a program of the United States government to purchase assets and equity from financial institutions to strengthen its financial sector that was signed into law by President George W. Bush on October 3, 2008. It was a component of the government's measures in 2008 to address the subprime mortgage crisis.

- 9 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

process which has predictably led to borrowers defaulting on these modifications just as they had on their original loans.  These predatory loan modification practices include, but are not limited to:

    i.   Requiring borrowers to be in arrears on their mortgage before they would be considered for a loan modification.

    ii.  Inducing borrowers to stop paying their mortgage even when they had the ability to do so thereby creating a credit nightmare for borrowers that otherwise had good credit.

    iii. Refusing to give loan modifications to holders of "jumbo" loans even though such borrowers had also been subject to predatory practices.

    iv. Informing holders of "jumbo" mortgages that they were not eligible for a loan modification only after they had been induced to stop paying their mortgages when it was known at all time to the lender that such borrowers would not be considered.

    v.  A practice known as "dual tracking" whereby the lender induced borrowers into reliance on the loan modification process as an alternative to foreclosure when it was actually occurring simultaneously.  In furtherance of this practice the lender accepted trial modification payments from borrowers while aggressively pursuing foreclosure via NOTICES OF DEFAULT and NOTICES OF TRUSTEES SALE.

    vi. Abusive of borrowers seeking modification by forcing them to speak to a different person each time they called, not retaining borrowers documents including highly sensitive personal financial information, and a lack of transparency about the lender's process.

    vii. Loan modifications that adjusted gradually upwards in interest rate so that they mimicked the initial ARM mortgages that borrowers were seeking to modify.

    viii. Loan modifications that simply added missed mortgage payments to the loan amount as principle and/or extended the lifetime of the loan from thirty (30) years to thirty-five (35) or forty (40) years thereby reaping exorbitant profits via interest payments for the lender.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

22.    "Dual tracking" has been outlawed by the Comptroller of the Currency, a U.S. Treasury Division.  John Welsh, together with The Office of Thrift Supervision, the Federal Reserve and the Federal Deposit Insurance Corp:

> "Going forward, banks may no longer simultaneously proceed with both loan modifications and foreclosures.  That 'dual track' process resulted in many cases where homeowners who were making trial loan modification payments suddenly has their homes repossessed.  Banks must establish a single point of contact-either one person or a team-for homeowners seeking assistance.  Many struggling homeowners say they had Kafkaesque experiences over and over again, each time explaining their situation from scratch to a new bank representative.  Banks must also develop plans for staffing, training and over-sight of outside firms.  Banks' plans for correcting foreclosure problems will be supervised by bank regulators."

23.    This action seeks remedies for the foregoing improper activities, including a massive fraud perpetrated upon Plaintiffs and other borrowers by the Defendants' business that devastated valves of their residences, in most cases resulting in Plaintiffs' loss of all or substantially all of their net worth.

24.    This lawsuit arises from Defendants' soliciting and accepting "trial modification" payments from borrowers in order to justify their receipt of TARP funds bestowed by the federal government to benefit borrowers via loan modifications, while at the same time failing to perform obligations incurred by their acceptance of TARP funds.

25.    This lawsuit arises from Defendants' breach of Plaintiffs' statutorily protected rights to receive NOTICE before a loan is assigned, with an opportunity to object to said ASSIGNMENT or find another lender themselves;

26.    This lawsuit arises from Defendants' knowing and willful breach of numerous consumer and homeowner statutes designed to protect borrowers

27.    This lawsuit arises from Defendants' lack of standing to foreclose in that Defendant, and others alleged to have ownership do not actually have ownership, having unlawfully sold, assigned, and/or transferred their ownership and security interest in the Promissory NOTE and DEED OF TRUST related to Plaintiffs' properties, and, thus, do not have lawful ownership or a security interest in these properties which are described in detail herein. Plaintiffs allege that Defendant, and Defendants and Defendant's predecessors in interest, cannot show proper receipt, possession, transfer, negotiation,

- 11 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1   assignment, and ownership of the borrowers' original Promissory NOTE and DEED OF TRUST,

2   resulting in imperfect security interests and claims and fraudulent assertion of a beneficial interest.

3        28.    This lawsuit arises from the unlawful acceptance, by Defendant, of monies from

4   Plaintiffs in the form of "loan modification payments" not credited to Plaintiffs' mortgage account,

5   mortgage payments diverted to escrow accounts and fraudulent late fees and charges.

6        29.    This lawsuit arises from Defendant's breach of contract for, among other things, not

7   providing Plaintiffs with a borrower's copy of their DEED OF TRUST, either at the time of signing or

8   immediately after, pursuant to the contract they signed and statutory law.  Plaintiffs allege that

9   Defendant violated laws, breached contracts, and repeatedly and intentionally failed to honor

10   agreements with borrowers. This action seeks Declaratory Judgment for all Plaintiffs as well as

11   remedies for the foregoing improper activities, including, but not limited to, damages, principal

12   reductions, and new loans at the current interest rate or the cost of such a loan.

13        30.    This action seeks Declaratory Judgment for all Plaintiffs as well as remedies for the

14   foregoing improper activities, including, but not limited to, damages, principal reductions, and new

   loans at the current interest rate or the cost of such a loan.

**PARTIES**

<u>PLAINTIFFS</u>

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

## COMPLAINT

COMES NOW Plaintiff Monireh Bozorgi ("Plaintiff" or "Ms. Bozorgi"), by and through her counsel, for her Complaint against Defendants World Savings Bank (in its' capacity as originating lender) (hereinafter "World Savings"); The Bank of New York Mellon F/K/A The Bank of New York, As Trustee for the Certificateholders of the REMIC 16 Trust (in its capacity as purported beneficiary of Plaintiff's Note and Deed of Trust) (hereinafter "Bank of New York"); and Wachovia Mortgage Corporation (in its capacity as purported servicer) (hereinafter "Wachovia Mortgage") (collectively "Defendants"), and pleads as follows:

## I.    STATEMENT OF THE CASE

1.    Plaintiff alleges that Defendants are third-party strangers to her mortgage loan and have no ownership interest entitling them to collect payment or declare a default.  By hiding behind the complexities of the mortgage finance system, Defendants brazenly attempt to dupe Plaintiff (and millions of other American homeowners) into believing that they have the right to collect on a debt in which Bank of New York has no ownership interest.  Through this action, Plaintiff seeks to stop Defendants' fraudulent practices and demand that the identity of her true creditor be revealed.

## II.    JURISDICTION, VENUE AND PARTIES

2.    Plaintiff was the Debtor in the          -captioned bankruptcy case.  She commenced the case on September 29, 2010.

3.    This action is brought pursuant to Rule 7001 et seq. of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to seek relief in accordance with 11 U.S.C. §§ 105, 502, and other applicable law.

4.    This adversary proceeding arises out of and relates to the above-captioned Chapter 13 case.

5.    The Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is both a core and non-core proceeding as to which this Court may enter a final judgment under 28 U.S.C. §§157(b)(1) and 157(b)(2)(A).

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a), as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 of the United States Code (the "Bankruptcy Code") which was pending before this district, until wells fargo N/A fraudey foreclosed on the subject property. 05.11,2015

7.     The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in the Southern District of California and the involved real property located in the Southern District of California.  Therefore, venue properly lies in this District, pursuant to 12 U.S.C. §2614 and 28 U.S.C. §1391(b).

8.     Plaintiff was , and at all times mentioned herein, an individual residing in the County of San Diego.  At all times relevant to this action, Plaintiff has owned real property commonly known as 11862 Meajean Place, San Diego, CA 92129 (the "Property").  Further described as Assessor's Parcel Number 315-561-50-00, with the following description:

> LOT 210 OF MERCY MIRA MESA UNIT NO. 3, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12037, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, ON MARCH 29, 1988.

9.     At all relevant times, World Savings, with its principal place of business in North Carolina, transacted business throughout the State of California, including in San Diego County.

10.     At all relevant times, Bank of New York, a New York corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County.

11.     At all relevant times, Wachovia Mortgage, a North Carolina corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County.

12.     Plaintiff is ignorant of the true identity and capacity of defendants designated as Does 1-100, but will amend the Complaint when their identities have been ascertained according to proof at the time of trial.  Plaintiff alleges on information and belief, however, that each and every Doe Defendant is in some manner responsible for

VERIFIED COMPLAINT                    14

1   the acts, and conduct of the other defendants, and were, and are responsible for the

2   injuries, damages, and harm, incurred by Plaintiff.  Plaintiff further alleges on

3   information and belief that each such designated defendant acted, and acts, as the

4   authorized agent, representative, and associate of the other defendants in doing the

5   things alleged herein.

6        13.    Whenever reference is made in this Complaint to any act of any

7   defendant(s), that allegation shall mean that each defendant acted individually and

8   jointly with the other defendants.

9        14.    Any allegation about acts of any corporate or other business defendant

10   means that the corporation or other business did the acts alleged through its officers,

11   directors, employees, agents and/or representatives while they were acting within the

12   actual or ostensible scope of his authority.

13        15.    At all relevant times, each defendant committed the acts, caused or directed

14   others to commit the acts, or permitted others to commit the acts alleged in this

15   Complaint.  Additionally, some or all of the defendants acted as the agent of the other

16   defendants, and all of the defendants acted within the scope of their agency if acting as

17   an agent of the other.

18        16.    At all relevant times, each defendant knew or realized that the other

19   defendants were engaging in or planned to engage in the violations of law alleged in this

20   Complaint.  Knowing or realizing that the other defendants were engaging in or

21   planning to engage in unlawful conduct, each defendant nevertheless facilitated the

22   commission of those unlawful acts.  Each defendant intended to and did encourage,

23   facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted

24   the other defendants in the unlawful conduct.

25   **III.   INTRODUCTION**

26        17.    During the Mortgage Boom Era of 2002 to 2007, Wall Street investors

27   looked to feed their insatiable and reckless greed for profit by tapping directly into the

28   American Dream – homeownership.  Mortgage lenders and Investment Banks

1  aggressively lured the American people into predatory loans with teaser interest rates
2  and into purchasing homes with inflated appraisals and under the promise that the
3  booming real estate market would continue to boom.  Wall Street took the soon to be
4  toxic loans and bundled them into "Mortgage Backed Securities" through a process
5  known as "Securitization".  These securities were then sold to investors in the form of
6  certificates, whereby the investors became the "Certificateholders" of the securities that
7  were to be fed by the toxic loans.

8      18.    Knowing that the predatory loans would soon default and turn into toxic
9  assets, Wall Street placed their bets accordingly and bought exotic insurance products in
10 the form of Credit Default Swaps.  Thus, when the Mortgage Boom turned into a
11 Mortgage Meltdown (which it did), they would stand to make even more profit when the
12 mortgage insurance paid them out for their "losses".

13     19.    However, in their rush to "securitize" the predatory loans, Wall Street
14 failed to actually follow its own rules and regulations, creating the instant situation
15 where the securities are not actually backed by any mortgages at all.  Under the standard
16 model, the promissory notes were *supposed* to be sold and transferred into a trust pool
17 ("Securitized Trust") that holds the promissory notes as collateral on the securities
18 ("Certificates") bought by investors ("Certificateholders").  These "true sales" allow the
19 original lenders to move the notes off their books, eliminating the need to maintain
20 capital-adequacy reserves against default.  The purpose of securitizing collateral debt
21 obligations was to provide a large supply of money to lenders for originating loans, and
22 to provide investment to bond holders – which were expected to be relatively safe.

23     20.    The Securitized Trusts, if ever formed properly, are subject to and governed
24 by (1) Pooling and Servicing Agreement ("PSA"); (2) the Mortgage and Loan Purchase
25 Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of Delaware or
26 New York, depending on its origin, and (5) Internal Revenue Code § 860A through
27 860G, better known as the Real Estate Mortgage Investment Conduit ("REMIC") rules.
28

21.     An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering.  This is necessary in order for the Trustee of the Securitized Trust to be legally entitled to enforce the mortgage loans.  In addition to other required documentation to complete the Mortgage File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process, including but not limited to – the promissory note and the security instrument (deed of trust or mortgage).  In this case, on information and belief, neither document was validly transferred.

22.     Here, Plaintiff alleges that the "true sales" never took place due to the failure to follow the basic legal requirements for the transfer of a negotiable instrument and thereby, the legal, equitable, and pecuniary interest in Ms. Bozorgi's Note and Mortgage.  As a result thereof, Bank of New York, which purports to be Ms. Bozorgi's creditor, actually has no right, title, or interest in Ms. Bozorgi's Note and Mortgage, and has no right to collect mortgage payments, demand mortgage payments, or report derogatorily against Ms. Bozorgi's credit.[1]

23.     Plaintiff further alleges that, on information and belief, the REMIC 16 Trust that purportedly owns Plaintiff's Note and Mortgage has been dismantled due to the disbursement and receipt of mortgage insurance payouts to Bank of New York and the Certificateholders (including, but not limited to, credit default swaps and other mortgage insurance products).  As a result of these mortgage insurance payouts, Bank of New York has been paid in full on Plaintiff's debt obligation.

---

[1] Plaintiff's allegations are supported by the recent ruling of the Massachusetts Supreme Judicial Court in *Deutsche vs. Ibanez*, SJC-10694, 2011 WL 38071. In *Ibanez*, the Court invalidated two foreclosure sales, finding that the lower court did not err in concluding that the securitization documents submitted by the Plaintiff failed to demonstrate that they were the holders of the mortgages. The Court rejected the banks' argument that the mortgages were transferred via the applicable Pooling and Servicing Agreement and made clear that, to foreclose, the banks must prove a complete and unbroken chain of title from origination to securitization trust in full compliance of the PSA, i.e. establish ownership of the mortgage.

24.   Nonetheless, Bank of New York attempts to take advantage of the complex structured finance system to defraud yet another homeowner who has sought for over a year to come to a financial arrangement with their true creditor and avoid the possibility of double financial jeopardy. Plaintiff alleges that, Wachovia Mortgage and/or Bank of New York will seek a Court-sanctioned bailout asking the Court for judgment in their favor, and misleading the Plaintiff into believing that Wachovia Mortgage and/or Bank of New York was her actual creditor.

25.   Plaintiff does : dispute that she owes money on her mortgage obligation.[2] Rather, Plaintiff disputes the amount owed, and the right of Wachovia Mortgage and/or Bank of New York to claim a secured or unsecured interest in the Note or Mortgage.

26.   Plaintiff's information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; and (3) her counsel's research, experience, and extensive review of depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly available securitization documents & practices; and (4) an audit of Bank of New York's filings with the Securities and Exchange Commission ("SEC"), including a Bank of New York 424B5 Prospectus and PSA.

27.   Plaintiff's information and belief is further based on a Securitization Audit of her Note and Mortgage that Ms. Bozorgi commissioned in order to help determine (1) the owner of her loan, and (2) the secured/unsecured status of her Note and Mortgage.

28.   Based on the findings of the Audit, Plaintiff believes and alleges thereon that her Note was supposed to be properly securitized as a mortgage-backed security that is, "pooled" together in a trust pool. The trust is regulated by New York Trust Law, specifically §7-2.01(c). Plaintiff alleges that her Note was *not* properly securitized and that the Trust has no legal, equitable, or monetary interest in her Promissory Note such

---

[2] However, simply because Plaintiff does not dispute this fact, the Court should not condone Bank of New York's fraudulent and predatory mortgage servicing practices and allow it to collect on money it was not owed. Simply put, the Court should not allow Bank of New York to trample over 200 years of well-settled property laws just because Plaintiff "owes somebody the money".

1    that it can demand payment from her.  After conducting a Securitization Audit of Ms.

2    Bozorgi's chain of title and Bank of New York's PSA, it was determined that Ms.

3    Bozorgi's Note and Mortgage were not properly conveyed into the REMIC 16 Trust (if

4    it was ever properly formed) because (1) the beneficial interest in Plaintiff's Note and

5    Mortgage were not effectively assigned, granted, or transferred to the Sponsor or

6    Depositor (who were supposed to convey Plaintiff's Note and Mortgage to the Trust)

7    prior to the Closing Date of the Trust; and (2) Bank of New York failed to perfect the

8    title to Ms. Bozorgi's Note and Mortgage by not *strictly* following the requirements of

9    the PSA and other agreements that govern the administration of the Trust.  As the

10   purported Trustee of the Trust, Bank of New York cannot take action which is not

11   authorized by the agreements that created and govern the Trust.  Bank of New York's

12   attempt to acquire an interest in Plaintiffs' loan after the closing date indicated in the

13   PSA, is an ultra vires act that is violation of the Trust Agreement (PSA).

14        29.    On or about July 29, 2004, Ms. Bozorgi executed a Note and Mortgage in

15   favor of World Savings, obtaining a loan on the Property in the amount of

16   approximately $ 400,000 .00.

17        30.    Plaintiff alleges and believes thereon that on or around the time of

18   origination of Ms. Bozorgi's loan, World Savings attempted to securitize and sell her

19   loan to another entity or entities. **That entity was *not* Bank of New York**.

20   Plaintiff alleges on information and belief that World Savings never sold her Mortgage

21   to Bank of New York, and that Bank of New York is merely third-party stranger to the

22   loan transaction.  Furthermore, Plaintiff alleges that none of the Defendants or Doe

23   Defendants can demonstrate or document that Plaintiff's Note was ever properly

24   endorsed, and transferred to Bank of New York.  In fact, Plaintiff has requested that

25   Wachovia Mortgage provide evidence establishing the true and correct owner of her

26   loan.  Although this information should be readily available to any mortgage servicer,

27   Wachovia Mortgage has failed to provide any such evidence to verify the owner of

28   Plaintiff's Mortgage, or the true and correct amount that is owed.

VERIFIED COMPLAINT                          19

31.     The parties involved in the purported Securitization and transfer of Plaintiff's Note and Mortgage failed to adhere to section 2.01 of the PSA, which requires that Plaintiff's Note and Mortgage be properly endorsed, transferred, accepted, and deposited with the Securitized Trust (hereinafter "Trust") (or its custodian) on or before August 19, 2004, the "closing date" indicated on the PSA. The "closing date" is the date by which all of the Notes and Mortgages must have been transferred into the REMIC 16 Trust. The failure to do so results in the Note and Mortgage not being part of the REMIC 16 Trust res, such that it is not a loan that Bank of New York can attempt to collect on.

32.     There is no duly acknowledged or recorded "Assignment" which was purportedly executed before the closing date of the Trust and therefore did not even transfer Plaintiff's Note and Mortgage to Bank of New York. The lack of an "Assignment" raises numerous red flags as it supports that Plaintiff's Note and Mortgage were not deposited into the REMIC 16 Trust by the closing date. The failure to deposit the Note into the REMIC 16 Trust before the closing date is a violation of the PSA and of New York trust law. Consequently, the REMIC 16 Trust cannot claim any legal or equitable right, title, or interest in Ms. Bozorgi's Note and Mortgage since Bank of New York cannot take any action which is not authorized by the Securitization agreements that created and govern the REMIC 16 Trust.

33.     The failure to deposit and transfer the Note into the REMIC 16 Trust before the closing date is a violation of the PSA and of New York trust law. Consequently, the REMIC 16 Trust has no legal or equitable right, title, or interest in Ms. Bozorgi's Note and Mortgage since the Bank of New York nor Wachovia Mortgage can take any action which is not authorized by the Securitization agreements that created and govern the REMIC 16 Trust.

34.     Ms. Bozorgi relied on Wachovia Mortgage's misrepresentations and has been damaged in the following ways: (1) she has been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (2) the

1   title to Ms. Bozorgi's home has been clouded and rendered unmarketable; (3) Ms.

2   Bozorgi has expended significant funds to cover the cost of attorneys' fees and related

3   costs; (4) she has suffered damage to her reputation in the community; (5) multiple

4   parties may seek to enforce her debt obligation against her; (6) Ms. Bozorgi paid World

5   Savings $206,000.00 on November 28, 2006; and (7) any would-be buyer of Plaintiff's

6   home will find themselves in legal limbo, unable to know with any certainty whether

7   they can safely buy Plaintiff's home or get title insurance.

8       35.    In addition to seeking compensatory, consequential, punitive, attorneys'

9   fees, costs and other damages, Plaintiff seeks Declaratory Relief as to whether the Deed

10  of Trust (Mortgage) secures any obligation of Plaintiff in favor of Bank of New York,

11  such that they can collect Plaintiff's mortgage payments, demand payment, or engage in

12  debt collection activities and a final judgment granting Plaintiff quiet title in the

13  Property.

14  **IV.    PLAINTIFF'S ATTEMPTS TO VERIFY AND VALIDATE HER DEBT**

15      36.    On July 12, 2011, in an effort to verify and validate her debt, Ms. Bozorgi

16  sent a Qualified Written Request letter pursuant to Real Estate Settlement Procedures

17  Act, 12 U.S.C. 2605(e), in which she requested that the servicer provide, among other

18  things, "the name, address, name of a contact person and telephone number of the

19  current holder in due course and owner of the mortgage note." *See* **Exhibit "A"**

20  attached herein, Plaintiff's Qualified Written Request. 12 U.S.C. 2605(e) requires that

21  the servicer provide this information and respond to a written request within 60 days of

22  receipt. Defendant Wachovia Mortgage has not yet responded.

23
24  **V.    THE ABSENCE OF AN ASSIGNMENT OF DEED OF TRUST
    INDICATES THAT NO INTEREST WAS EVER CONVEYED TO BANK
    OF NEW YORK**
25

26      37.    There is no duly acknowledged Assignment recorded with the County of

27  San Diego that transferred an interest in Plaintiff's Note and Mortgage to Bank of New

28  York. Plaintiff alleges that this is because no transfer of interest ever occurred.

VERIFIED COMPLAINT              21

1      38.   The lack of an "Assignment" supports the fact that Defendants are

2  facilitating and aiding & abetting the illegal, deceptive, and unlawful enforcement of

3  Plaintiff's Note and Mortgage and engaging in other illegal debt collection activities.

4      39.   Wachovia Mortgage has been acting in a manner to mislead Ms. Bozorgi

5  into believing that Wachovia Mortgage had the authority to demand payments from her.

6      40.   Plaintiff further alleges that any amount allegedly owed under the Note is

7  subject to equitable offset by the damages owed to Plaintiff from Defendants.

8      41.   As alleged herein, Plaintiff's Note was not properly negotiated, endorsed,

9  and transferred to Wachovia Mortgage or Bank of New York, who seek to cause their

10  purported authorized agent(s) to collect mortgage payments and engage in other

11  unlawful collection practices.

12      42.   California Commercial Code § 3301 limits a negotiable instrument's

13  enforcement to the following:

> "Person entitled to enforce" an Instrument means (a) the holder of the instrument, (b) a nonholder in possession of the instrument who has the rights of a holder, or (c) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3309 or subdivision (d) of Section 3418. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

20      43.   On information and belief, none of the Defendants were/are present holders

21  in due course of Plaintiff's Note such that they can enforce Plaintiff's obligation and

22  demand mortgage payments.

23      44.   On information and belief, neither Wachovia Mortgage nor Bank of New

24  York is/was a nonholder in possession of Plaintiff's Note who has rights of the holder.

25      45.   If there is a holder in due course of Plaintiff's Note at issue, pursuant to

26  California Commercial Code § 3301, et seq. and/or the PSA it is the entity that can

27

28

1    establish a pecuniary, legal, and equitable interest in the Property, and provide an

2    unbroken chain of title to Plaintiff's Note and Mortgage.[3]

3        46.    On information and belief, none of the Defendants were/are entitled to

4    enforce Plaintiffs' Note pursuant to § 3309 or subdivision (d) of § 3418.

5        47.    Plaintiff alleges that, on information and belief, Bank of New York

6    fraudulently enforced a debt obligation in which they had no pecuniary, equitable or

7    legal interest.  Wachovia Mortgage's conduct is part of a fraudulent debt collection

8    scheme.

9    **VI.    PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER,**
         **SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGE**
10

11       48.    The conduct described above of Wachovia Mortgage and/or Bank of New

12   York, was malicious because Defendants knew that they were not acting on behalf of the

13   current pecuniary beneficiary of the Note and Mortgage.  However, despite such

14   knowledge, said Defendants represented to Plaintiff that they were agents authorized to

15   collect on her debt.

16       49.    Wachovia Mortgage and/or Bank of New York engaged and is engaging in

17   a pattern and practice of defrauding Plaintiff, in that, on information and belief, during

18   the entire life of the mortgage loan, Wachovia Mortgage and/or Bank of New York

19   failed to properly credit payments made; incorrectly calculated interest on the accounts;

20   and has failed to accurately debit fees.

21       50.    On information and belief, at all times material, Wachovia Mortgage and/or

22   Bank of New York had and have actual knowledge that Plaintiff's accounts were not

23

24

---

25       [3] Specifically, Plaintiffs' information and belief is based on the testimony of Linda DeMartini in *In Re Kemp*,
     Case No. 08-18700-JHW, (Bankr. D. N.J. November 16, 2010) (for publication), exposes the shoddy handling of the
26   mortgage note and deed of trust of securitized mortgages required to perfect "holder in due course" status.  In that case
     Linda DeMartini, a 10-year litigation manager for Countrywide described how Countrywide failed to adhere to the most
27   rudimentary of securitization procedures, such as transferring the original promissory note to the trusts that had purchased
     the loans, as required under the pooling and servicing agreement.  Ms. DeMartini testified that it was standard practice for
28   Countrywide to hold onto the original mortgage notes, which were stored in Simi Valley, California, despite securitization
     contracts that require the notes be physically transferred to sponsors, trustees or custodians.

VERIFIED COMPLAINT                              23

1   accurate, but that Plaintiff would make further payments based on Defendants'
2   inaccurate accounts.

3       51.    On information and belief, Plaintiff made payments based on the improper,
4   inaccurate, and fraudulent representations as to Plaintiff's accounts.

5       52.    As a direct and proximate result of the actions of the Defendants set forth
6   above, Plaintiff overpaid in interest.

7       53.    As a direct and proximate result of the actions of the Defendants set forth
8   above, Plaintiff's credit and credit score have been severely damaged.  Specifically,
9   because of the derogatory credit reporting on her credit report by Bank of New York
10  and/or Wachovia Mortgage.  Ms. Bozorgi is unable to refinance out her present loan,
11  sell her home or qualify for a loan to buy another property.

12      54.    As a direct and proximate result of the actions of the Defendants set forth
13  above, the title to Plaintiff's home has been slandered, clouded, and its salability has
14  been rendered unmarketable.

15      55.    As a direct and proximate result of the actions of the Defendants set forth
16  above, Plaintiff does not know who the current beneficiary of her Note and Mortgage
17  actually is, such that she is now subject to double financial jeopardy.

18      56.    As a direct and proximate result of the actions of the Defendants set forth
19  above, multiple parties can potentially claim an interest in the subject loan.

20      57.    The conduct of Wachovia Mortgage, Bank of New York and/or and one or
21  more of the Doe Defendants have led to the imminent loss of Plaintiff's home and to
22  pecuniary damages.  The pecuniary damages include, but are not limited to, the costs of
23  overcalculation and overpayment of interest, the costs of repairing Plaintiff's credit, the
24  reduction and/or elimination of Plaintiff's credit limits, costs associated with removing
25  the cloud from her property title and attorneys' fees, in an amount to be proven at trial,
26  but in excess of $75,000.00.

27      58.    The conduct of Bank of New York, Wachovia Mortgage and one or more
28  of the Doe Defendants was malicious.  Said Defendants' conduct was malicious because

1   Defendants did not know the identity of the current and true beneficiary of Plaintiff's
2   Note and Deed of Trust, yet still wrongfully demanded payments and  reported
3   derogatorily to credit bureaus causing harm to Plaintiff's credit  and make said title
4   unmarketable.

5         59.     The title to Plaintiff's Property has been rendered unmarketable and
6   unsalable because of the multiple claims being made against her Property.

7         60.     Plaintiff will be denied the opportunity to identify her true and current
8   creditor/lender/beneficiary.

9         61.     Plaintiff has offered to and is ready, willing, and able to unconditionally
10  tender her obligation.

11        62.     Plaintiff alleges that the equitable and beneficial interest in her Note and
12  Deed of Trust do not belong to any of the Defendants or Doe Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COMPLAINT

COMES NOW Plaintiff Farrah Nazemi    ("Plaintiff" or "Ms. Nazemi), by and
(Wells Fargo N/A)
through her counsel, for her Complaint against Defendants World Savings Bank (in its
capacity as originating lender) (hereinafter "World Savings"); The Bank of New York
Mellon F/K/A The Bank of New York, As Trustee for the Certificateholders of the
REMIC 16 Trust (in its capacity as purported beneficiary of Plaintiff's Note and Deed of
Trust) (hereinafter "Bank of New York"); and Wachovia Mortgage Corporation (in its
capacity as purported servicer) (hereinafter "Wachovia Mortgage") (collectively
"Defendants"), and pleads as follows:

## I.   STATEMENT OF THE CASE

1.      Plaintiff alleges that Defendants are third-party strangers to her mortgage
loan and have no ownership interest entitling them to collect payment or declare a
default.  By hiding behind the complexities of the mortgage finance system, Defendants
brazenly attempt to dupe Plaintiff (and millions of other American homeowners) into
believing that they have the right to collect on a debt in which Bank of New York has no
ownership interest.  Through this action, Plaintiff seeks to stop Defendants' fraudulent
practices and demand that the identity of her true creditor be revealed.

## II.   JURISDICTION, VENUE AND PARTIES

2.      Plaintiff is the Debtor in the above-captioned bankruptcy case.  She
commenced the case on  June 24,2014.

3.      This action is brought pursuant to Rule 7001 et seq. of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules") to seek relief in accordance with 11
U.S.C. §§ 105, 502, and other applicable law.

4.      This adversary proceeding arises out of and relates to the above-captioned
Chapter 7 case. Wells Fargo N/A was asked by the bankruptcy court to show prof of
ownership of the subject property but Wells Fargo never did.
5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157
and 1334.  This is both a core and non-core proceeding as to which the Court        enter
a final judgment under 28 U.S.C. §§157(b)(1) and 157(b)(2)(A).

VERIFIED COMPLAINT

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a), as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 of the United States Code (the "Bankruptcy Code") which is pending before this district.

7.     The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in the Southern District of California and the involved real property located in the Southern District of California. Therefore, venue properly lies in this District, pursuant to 12 U.S.C. §2614 and 28 U.S.C. §1391(b).

8.     Plaintiff is now, and at all times mentioned herein, an individual residing in the County of San Diego. At all times relevant to this action, Plaintiff has owned real property commonly known as 260 Camino Del Cerro Grande Bonita CA 91902   (the "Property"). Further described as Assessor's Parcel Number 593-160-10   , with the following description:

LOT 68 OF BONITA BELAIRE, CITY OF CHULA VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 12037, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, ON NOVEMBER 26, 1962.

9.     At all relevant times, World Savings, with its principal place of business in North Carolina, transacted business throughout the State of California, including in San Diego County.

10.     At all relevant times, Bank of New York, a New York corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County.

11.     At all relevant times, Wachovia Mortgage, a North Carolina corporation, has transacted and continues to transact business throughout the State of California, including in San Diego County.

12.     Plaintiff is ignorant of the true identity and capacity of defendants designated as Does 1-100, but will amend the Complaint when their identities have been ascertained according to proof at the time of trial. Plaintiff alleges on information and belief, however, that each and every Doe Defendant is in some manner responsible for

VERIFIED COMPLAINT

1    the acts, and conduct of the other defendants, and were, and are responsible for the

2    injuries, damages, and harm, incurred by Plaintiff.  Plaintiff further alleges on

3    information and belief that each such designated defendant acted, and acts, as the

4    authorized agent, representative, and associate of the other defendants in doing the

5    things alleged herein.

6        13.    Whenever reference is made in this Complaint to any act of any

7    defendant(s), that allegation shall mean that each defendant acted individually and

8    jointly with the other defendants.

9        14.    Any allegation about acts of any corporate or other business defendant

10   means that the corporation or other business did the acts alleged through its officers,

11   directors, employees, agents and/or representatives while they were acting within the

12   actual or ostensible scope of his authority.

13       15.    At all relevant times, each defendant committed the acts, caused or directed

14   others to commit the acts, or permitted others to commit the acts alleged in this

15   Complaint.  Additionally, some or all of the defendants acted as the agent of the other

16   defendants, and all of the defendants acted within the scope of their agency if acting as

17   an agent of the other.

18       16.    At all relevant times, each defendant knew or realized that the other

19   defendants were engaging in or planned to engage in the violations of law alleged in this

20   Complaint.  Knowing or realizing that the other defendants were engaging in or

21   planning to engage in unlawful conduct, each defendant nevertheless facilitated the

22   commission of those unlawful acts.  Each defendant intended to and did encourage,

23   facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted

24   the other defendants in the unlawful conduct.

25   **III.    INTRODUCTION**

26       17.    During the Mortgage Boom Era of 2002 to 2007, Wall Street investors

27   looked to feed their insatiable and reckless greed for profit by tapping directly into the

28   American Dream – homeownership.  Mortgage lenders and Investment Banks

VERIFIED COMPLAINT

1  aggressively lured the American people into predatory loans with teaser interest rates
2  and into purchasing homes with inflated appraisals and under the promise that the
3  booming real estate market would continue to boom.  Wall Street took the soon to be
4  toxic loans and bundled them into "Mortgage Backed Securities" through a process
5  known as "Securitization".  These securities were then sold to investors in the form of
6  certificates, whereby the investors became the "Certificateholders" of the securities that
7  were to be fed by the toxic loans.

8       18.    Knowing that the predatory loans would soon default and turn into toxic
9  assets, Wall Street placed their bets accordingly and bought exotic insurance products in
10  the form of Credit Default Swaps.  Thus, when the Mortgage Boom turned into a
11  Mortgage Meltdown (which it did), they would stand to make even more profit when the
12  mortgage insurance paid them out for their "losses".

13       19.    However, in their rush to "securitize" the predatory loans, Wall Street
14  failed to actually follow its own rules and regulations, creating the instant situation
15  where the securities are not actually backed by any mortgages at all.  Under the standard
16  model, the promissory notes were *supposed* to be sold and transferred into a trust pool
17  ("Securitized Trust") that holds the promissory notes as collateral on the securities
18  ("Certificates") bought by investors ("Certificateholders").  These "true sales" allow the
19  original lenders to move the notes off their books, eliminating the need to maintain
20  capital-adequacy reserves against default.  The purpose of securitizing collateral debt
21  obligations was to provide a large supply of money to lenders for originating loans, and
22  to provide investment to bond holders – which were expected to be relatively safe.

23       20.    The Securitized Trusts, if ever formed properly, are subject to and governed
24  by (1) Pooling and Servicing Agreement ("PSA"); (2) the Mortgage and Loan Purchase
25  Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of Delaware or
26  New York, depending on its origin, and (5) Internal Revenue Code § 860A through
27  860G, better known as the Real Estate Mortgage Investment Conduit ("REMIC") rules.

28

VERIFIED COMPLAINT

21. An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering. This is necessary in order for the Trustee of the Securitized Trust to be legally entitled to enforce the mortgage loans. In addition to other required documentation to complete the Mortgage File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process, including but not limited to – the promissory note and the security instrument (deed of trust or mortgage). In this case, on information and belief, neither document was validly transferred.

22. Here, Plaintiff alleges that the "true sales" never took place due to the failure to follow the basic legal requirements for the transfer of a negotiable instrument and thereby, the legal, equitable, and pecuniary interest in Ms. Nazemi's Note and Mortgage. As a result thereof, Bank of New York, which purports to be Ms. Nazemi's creditor, actually has no right, title, or interest in Ms. Nazemi's Note and Mortgage, and has no right to collect mortgage payments, demand mortgage payments, or report derogatorily against Ms. Nazemi's credit.[1]

23. Plaintiff further alleges that, on information and belief, the REMIC 16 Trust that purportedly owns Plaintiff's Note and Mortgage has been dismantled due to the disbursement and receipt of mortgage insurance payouts to Bank of New York and the Certificateholders (including, but not limited to, credit default swaps and other mortgage insurance products). As a result of these mortgage insurance payouts, Bank of New York has been paid in full on Plaintiff's debt obligation.

---

[1] Plaintiff's allegations are supported by the recent ruling of the Massachusetts Supreme Judicial Court in *Deutsche* vs. *Ibanez*, SJC-10694, 2011 WL 38071. In *Ibanez*, the Court invalidated two foreclosure sales, finding that the lower court did not err in concluding that the securitization documents submitted by the Plaintiff failed to demonstrate that they were the holders of the mortgages. The Court rejected the banks' argument that the mortgages were transferred via the applicable Pooling and Servicing Agreement and made clear that, to foreclose, the banks must prove a complete and unbroken chain of title from origination to securitization trust in full compliance of the PSA, i.e. establish ownership of the mortgage.

24.     Nonetheless, Bank of New York attempts to take advantage of the complex structured finance system to defraud yet another homeowner who has sought for over a year to come to a financial arrangement with their true creditor and avoid the possibility of double financial jeopardy.  Plaintiff alleges that, Wachovia Mortgage and/or Bank of (Wells Fargo N/A) New York will seek a Court-sanctioned bailout asking the Court for judgment in their favor, and misleading the Plaintiff into believing that Wachovia Mortgage and/or Bank (Wells Fargo N/A) of New York was her actual creditor.

25.     Plaintiff does so  dispute that she owes money on her mortgage obligation.[2] Rather, Plaintiff disputes the amount owed, and the right of Wachovia Mortgage and/or (Wells Fargo N/A) Bank of New York to claim a secured or unsecured interest in the Note or Mortgage.

26.     Plaintiff's information and belief is based on (1) a title report and analysis of the Property's county records; (2) direct written and oral communication with Defendants; and (3) her counsel's research, experience, and extensive review of depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly available securitization documents & practices; and (4) an audit of Bank of New York's filings with the Securities and Exchange Commission ("SEC"), including a Bank of New York 424B5 Prospectus and PSA.

27.     Plaintiff's information and belief is further based on a Securitization Audit of her Note and Mortgage that Ms. Nazemi  commissioned in order to help determine (1) the owner of her loan, and (2) the secured/unsecured status of her Note and Mortgage.

28.     Based on the findings of the Audit, Plaintiff believes and alleges thereon that her Note was supposed to be properly securitized as a mortgage-backed security that is, "pooled" together in a trust pool.  The trust is regulated by New York Trust Law, specifically §7-2.01(c).  Plaintiff alleges that her Note was *not* properly securitized and that the Trust has no legal, equitable, or monetary interest in her Promissory Note such

---

[2] However, simply because Plaintiff does not dispute this fact, the Court should not condone Bank of New York's fraudulent and predatory mortgage servicing practices and allow it to collect on money it was not owed.  Simply put, the Court should not allow Bank of New York to trample over 200 years of well-settled property laws just because Plaintiff "owes somebody the money".

VERIFIED COMPLAINT

1   that it can demand payment from her.  After conducting a Securitization Audit of Ms.

2   Nazemi's chain of title and Bank of New York's PSA, it was determined that Ms.

3   Nazemi's Note and Mortgage were not properly conveyed into the REMIC 16 Trust (if

4   it was ever properly formed) because (1) the beneficial interest in Plaintiff's Note and

5   Mortgage were not effectively assigned, granted, or transferred to the Sponsor or

6   Depositor (who were supposed to convey Plaintiff's Note and Mortgage to the Trust)

7   prior to the Closing Date of the Trust; and (2) Bank of New York failed to perfect the

8   title to Ms. Nazemi's Note and Mortgage by not *strictly* following the requirements of

9   the PSA and other agreements that govern the administration of the Trust.  As the

10   purported Trustee of the Trust, Bank of New York cannot take action which is not

11   authorized by the agreements that created and govern the Trust.  Bank of New York's

12   attempt to acquire an interest in Plaintiffs' loan after the closing date indicated in the

13   PSA, is an ultra vires act that is violation of the Trust Agreement (PSA).

14        29.    On or about Oct,28,2004·, Ms. Nazemi executed a Note and Mortgage in

15   favor of World Savings, obtaining a loan on the Property in the amount of

16   approximately $400,000.00.

17        30.    Plaintiff alleges and believes thereon that on or around the time of

18   origination of Ms. Nazemi's loan, World Savings attempted to securitize and sell her

19   loan to another entity or entities.  That entity was *not* **Bank of New York**.

20   Plaintiff alleges on information and belief that World Savings never sold her Mortgage

21   to Bank of New York, and that Bank of New York is merely third-party stranger to the

22   loan transaction.  Furthermore, Plaintiff alleges that none of the Defendants or Doe

23   Defendants can demonstrate or document that Plaintiff's Note was ever properly

24   endorsed, and transferred to Bank of New York.  In fact, Plaintiff has requested that

     (Wells Fargo N/A)
25   Wachovia Mortgage provide evidence establishing the true and correct owner of her

26   loan.  Although this information should be readily available to any mortgage servicer,

     (Wells Fargo N/A)
27   Wachovia Mortgage has failed to provide any such evidence to verify the owner of

28   Plaintiff's Mortgage, or the true and correct amount that is owed.

VERIFIED COMPLAINT

31.   The parties involved in the purported Securitization and transfer of Plaintiff's Note and Mortgage failed to adhere to section 2.01 of the PSA, which requires that Plaintiff's Note and Mortgage be properly endorsed, transferred, accepted, and deposited with the Securitized Trust (hereinafter "Trust") (or its custodian) on or before Nov13, 04         , the "closing date" indicated on the PSA.  The "closing date" is the date by which all of the Notes and Mortgages must have been transferred into the REMIC 16 Trust.  The failure to do so results in the Note and Mortgage not being part of the REMIC 16 Trust res, such that it is not a loan that Bank of New York can attempt to collect on.

32.   There is no duly acknowledged or recorded "Assignment" which was purportedly executed before the closing date of the Trust and therefore did not even transfer Plaintiff's Note and Mortgage to Bank of New York.  The lack of an "Assignment" raises numerous red flags as it supports that Plaintiff's Note and Mortgage were not deposited into the REMIC 16 Trust by the closing date.  The failure to deposit the Note into the REMIC 16 Trust before the closing date is a violation of the PSA and of New York trust law.  Consequently, the REMIC 16 Trust cannot claim any legal or equitable right, title, or interest in Ms. Nazemi's Note and Mortgage since Bank of New York cannot take any action which is not authorized by the Securitization agreements that created and govern the REMIC 16 Trust.

33.   The failure to deposit and transfer the Note into the REMIC 16 Trust before the closing date is a violation of the PSA and of New York trust law.  Consequently, the REMIC 16 Trust has no legal or equitable right, title, or interest in Ms. Nazemi's Note and Mortgage since the Bank of New York nor Wachovia Mortgage (Wells Fargo N/A) can take any action which is not authorized by the Securitization agreements that created and govern the REMIC 16 Trust.

34.   Ms. Nazemi relied on Wachovia Mortgage's (Wells Fargo N/A) misrepresentations and has been damaged in the following ways: (1) she has been paying the wrong party for an undetermined amount of time and overpaid in interest that was overcalculated; (2) the

VERIFIED COMPLAINT

33

1 title to Ms. Nazemi 's home has been clouded and rendered unmarketable; (3) Ms.

2 Nazemi has expended significant funds to cover the cost of attorneys' fees and related

3 costs; (4) she has suffered damage to her reputation in the community; (5) multiple

4 parties may seek to enforce her debt obligation against her; (6) Ms. Nazemi paid World

5 Savings $400,000.00 on November 23, 2006; and (7) any would-be buyer of Plaintiff's

6 home will find themselves in legal limbo, unable to know with any certainty whether

7 they can safely buy Plaintiff's home or get title insurance.

8     35. In addition to seeking compensatory, consequential, punitive, attorneys'

9 fees, costs and other damages, Plaintiff seeks Declaratory Relief as to whether the Deed

10 of Trust (Mortgage) secures any obligation of Plaintiff in favor of Bank of New York,

11 such that they can collect Plaintiff's mortgage payments, demand payment, or engage in

12 debt collection activities and a final judgment granting Plaintiff quiet title in the

13 Property.

14 **IV. PLAINTIFF'S ATTEMPTS TO VERIFY AND VALIDATE HER DEBT**

15     36. On July 18, 2014, in an effort to verify and validate her debt, Ms. Nazemi

16 sent a Qualified Written Request letter pursuant to Real Estate Settlement Procedures

17 Act, 12 U.S.C. 2605(e), in which she requested that the servicer provide, among other

18 things, "the name, address, name of a contact person and telephone number of the

19 current holder in due course and owner of the mortgage note." *See* **Exhibit "8"**

20 attached herein, Plaintiff's Qualified Written Request. 12 U.S.C. 2605(e) requires that

21 the servicer provide this information and respond to a written request within 60 days of

                   (Wells Fargo N/A)

22 receipt. Defendant Wachovia Mortgage has not yet responded.

23

24 **V. THE ABSENCE OF AN ASSIGNMENT OF DEED OF TRUST INDICATES THAT NO INTEREST WAS EVER CONVEYED TO BANK OF NEW YORK**

25

26     37. There is no duly acknowledged Assignment recorded with the County of

27 San Diego that transferred an interest in Plaintiff's Note and Mortgage to Bank of New

28 York. Plaintiff alleges that this is because no transfer of interest ever occurred.

VERIFIED COMPLAINT           34

38.   The lack of an "Assignment" supports the fact that Defendants are facilitating and aiding & abetting the illegal, deceptive, and unlawful enforcement of Plaintiff's Note and Mortgage and engaging in other illegal debt collection activities.

39.   Wachovia Mortgage has been acting in a manner to mislead Ms. Nazemi into believing that Wells Fargo N/A had the authority to demand payments from her. *(Wells Fargo N/A)*

40.   Plaintiff further alleges that any amount allegedly owed under the Note is subject to equitable offset by the damages owed to Plaintiff from Defendants.

41.   As alleged herein, Plaintiff's Note was not properly negotiated, endorsed, and transferred to Wachovia Mortgage or Bank of New York, who seek to cause their purported authorized agent(s) to collect mortgage payments and engage in other unlawful collection practices.

42.   California Commercial Code § 3301 limits a negotiable instrument's enforcement to the following:

"Person entitled to enforce" an Instrument means (a) the holder of the instrument, (b) a nonholder in possession of the instrument who has the rights of a holder, or (c) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3309 or subdivision (d) of Section 3418. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

43.   On information and belief, none of the Defendants were/are present holders in due course of Plaintiff's Note such that they can enforce Plaintiff's obligation and demand mortgage payments.

44.   On information and belief, neither Wachovia Mortgage nor Bank of New York is/was a nonholder in possession of Plaintiff's Note who has rights of the holder. *Wells Fargo N/A*

45.   If there is a holder in due course of Plaintiff's Note at issue, pursuant to California Commercial Code § 3301, et seq. and/or the PSA it is the entity that can

1  establish a pecuniary, legal, and equitable interest in the Property, and provide an

2  unbroken chain of title to Plaintiff's Note and Mortgage.[3]

3      46.    On information and belief, none of the Defendants were/are entitled to

4  enforce Plaintiffs' Note pursuant to § 3309 or subdivision (d) of § 3418.

5      47.    Plaintiff alleges that, on information and belief, Bank of New York

6  fraudulently enforced a debt obligation in which they had no pecuniary, equitable or
        Wells Fargo N/A

7  legal interest.                    's conduct is part of a fraudulent debt collection

8  scheme.

9  VI.  **PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER,**

10      **SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGE**

                        (Wells Fargo N/A)

11      48.    The conduct described above of Wachovia Mortgage and/or Bank of New

12  York, was malicious because Defendants knew that they were not acting on behalf of the

13  current pecuniary beneficiary of the Note and Mortgage.  However, despite such

14  knowledge, said Defendants represented to Plaintiff that they were agents authorized to

15  collect on her debt.
            Wells Fargo N/A)

16      49.    Wachovia Mortgage and/or Bank of New York engaged and is engaging in

17  a pattern and practice of defrauding Plaintiff, in that, on information and belief, during
                                    (Wells Fargo N/A)

18  the entire life of the mortgage loan, Wachovia Mortgage and/or Bank of New York

19  failed to properly credit payments made; incorrectly calculated interest on the accounts;

20  and has failed to accurately debit fees.
                                        (Wells Fargo N/A)

21      50.    On information and belief, at all times material, Wachovia Mortgage and/or

22  Bank of New York had and have actual knowledge that Plaintiff's accounts were not

23

24

25      [3] Specifically, Plaintiffs' information and belief is based on the testimony of Linda DeMartini in *In Re Kemp*,
    Case No. 08-18700-JHW, (Bankr. D. N.J. November 16, 2010) (for publication), exposes the shoddy handling of the

26  mortgage note and deed of trust of securitized mortgages required to perfect "holder in due course" status.  In that case
    Linda DeMartini, a 10-year litigation manager for Countrywide described how Countrywide failed to adhere to the most

27  rudimentary of securitization procedures, such as transferring the original promissory note to the trusts that had purchased
    the loans, as required under the pooling and servicing agreement.  Ms. DeMartini testified that it was standard practice for

28  Countrywide to hold onto the original mortgage notes, which were stored in Simi Valley, California, despite securitization
    contracts that require the notes be physically transferred to sponsors, trustees or custodians.

VERIFIED COMPLAINT

1   accurate, but that Plaintiff would make further payments based on Defendants'

2   inaccurate accounts.

3       51.   On information and belief, Plaintiff made payments based on the improper,

4   inaccurate, and fraudulent representations as to Plaintiff's accounts.

5       52.   As a direct and proximate result of the actions of the Defendants set forth

6   above, Plaintiff overpaid in interest.

7       53.   As a direct and proximate result of the actions of the Defendants set forth

8   above, Plaintiff's credit and credit score have been severely damaged. Specifically,

9   because of the derogatory credit reporting on her credit report by Bank of New York
(Wells Fargo N/A)

10   and/or Wachovia Mortgage. Ms. Nazemi is unable to refinance out her present loan,

11   sell her home or qualify for a loan to buy another property.

12       54.   As a direct and proximate result of the actions of the Defendants set forth

13   above, the title to Plaintiff's home has been slandered, clouded, and its salability has

14   been rendered unmarketable.

15       55.   As a direct and proximate result of the actions of the Defendants set forth

16   above, Plaintiff does not know who the current beneficiary of her Note and Mortgage

17   actually is, such that she is now subject to double financial jeopardy.

18       56.   As a direct and proximate result of the actions of the Defendants set forth

19   above, multiple parties can potentially claim an interest in the subject loan.
(Wells Fargo N/A)

20       57.   The conduct of Wachovia Mortgage, Bank of New York and/or and one or

21   more of the Doe Defendants have led to the imminent loss of Plaintiff's home and to

22   pecuniary damages. The pecuniary damages include, but are not limited to, the costs of

23   overcalculation and overpayment of interest, the costs of repairing Plaintiff's credit, the

24   reduction and/or elimination of Plaintiff's credit limits, costs associated with removing

25   the cloud from her property title and attorneys' fees, in an amount to be proven at trial,

26   but in excess of $100,000.
(Wells Fargo N/A)

27       58.   The conduct of Bank of New York, Wachovia Mortgage and one or more

28   of the Doe Defendants was malicious. Said Defendants' conduct was malicious because

VERIFIED COMPLAINT

1   Defendants did not know the identity of the current and true beneficiary of Plaintiff's

2   Note and Deed of Trust, yet still wrongfully demanded payments and reported

3   derogatorily to credit bureaus causing harm to Plaintiff's credit and make said title

4   unmarketable.

5       59.    The title to Plaintiff's Property has been rendered unmarketable and

6   unsalable because of the multiple claims being made against her Property.

7       60.    Plaintiff will be denied the opportunity to identify her true and current

8   creditor/lender/beneficiary.

9       61.    Plaintiff has offered to and is ready, willing, and able to unconditionally

10   tender her obligation.

11       62.    Plaintiff alleges that the equitable and beneficial interest in her Note and

12   Deed of Trust do not belong to any of the Defendants or Doe Defendants.

13

14

15

16   **DEFENDANTS**

17       63.    Defendant WELLS FARGO BANK, NATIONAL ASSOCIATION (hereafter "WELLS

18   BANK") is, and, at all times herein mentioned was, a United States Corporation with the agent for

19   service of process as Corporation Service Company which will do business in California as CSC-

20

21

22

23

24

25

26

27

28

38-73

1  Lawyers Incorporating Service.  CSC's address is 2730 Gateway Oaks Drive, Suite 100, Sacramento,

2  California.

3      64.    Defendant WELLS FARGO HOME MORTGAGE, INC. (hereafter "WELLS HOME")

4  is a California Corporation with the agent for service of process as Corporation Service Company which

5  will do business in California as CSC-Lawyers Incorporating Service.  CSC's address is 2730 Gateway

Oaks Drive, Suite 100, Sacramento, California.

6      65.    Defendant WELLS FARGO BANK, N.A., A/K/A WACHOVIA MORTGAGES

7  (hereafter "WACHOVIA"), a division of WELLS FARGO BANK, N.A., and F/K/A WACHOVIA

8  MORTGAGES, FSB (hereafter "WACHOVIA MORTGAGE"), are North Carolina Corporations, with

9  the agent for service of process as Corporation Service Company which will do business in California as

10  CSC-Lawyers Incorporating Service.  CSC's address is 2730 Gateway Oaks Drive, Suite 100,

11  Sacramento, California.

12      66.    The true names and capacities of the Defendant listed herein as DOES 1 through 1,000

13  are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.  Each of the

14  DOE Defendants was the agent of each of the other Defendants herein, named or unnamed, and thereby

15  participated in all of the wrongdoing set forth herein.  On information and belief, each such Defendant is

16  responsible for the acts, events and concealment set forth herein and is sued for that reason.  Upon

17  learning the true names and capacities of the DOE Defendants, Plaintiffs shall amend this Complaint

accordingly.

18      67.    Plaintiffs believe and thereon allege that the agents and co-conspirators through which

19  the named Defendants operated included, without limitation, financial institutions and other firms that

20  originated loans on behalf of some or all of the Defendants.  These institutions acted at the behest and

21  direction of Defendants, or agreed to participate, knowingly or unknowingly, in the fraudulent schemes

22  described in this Complaint.

23      68.    Those firms originating loans that knowingly participated in the scheme are jointly and

24  severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and

25  ratifying the wrongful acts of the knowing participants.  Upon learning the true name of such knowing

26

- 73 -

27  **PLAINTIFFS' COMPLAINT FOR DAMAGES**

1   participants, Plaintiffs shall amend this Complaint to identify such knowing participants as Doe

2   Defendants.

3         69.    For avoidance of doubt, such knowing participants include, without limitation, legal and

4   natural persons owned in whole or in part by the enterprise or Defendants or affiliates thereof legal and

5   natural person owning directly or through affiliates financial interest in the enterprise or Defendant'

6   legal and natural person directly or through affiliates acting pursuant to the contracts to share in the

7   benefits of the wrongdoing alleged in this Complaint and knowing to at least some degree committing

8   acts and omissions in support thereof; and legal and natural persons knowing to at least some degree

9   acting in concert with the enterprise of the Defendants.

      70.    As to those legal and natural persons acting in concert without an express legal

10   relationship with Defendants or their affiliates, on information and belief, the Defendants knowingly

11   induced and encouraged the parallel acts, created circumstances permitting and authorizing the parallel

12   acts and omissions, benefitted from and ratified the improper behavior, therefore becoming jointly and

13   severally liable.

14         71.    As to those legal and natural persons whose acts in support of the loan scheme were

15   unwitting, Plaintiffs will consider whether and on what basis such persons might be liable for their acts

16   and omissions, created circumstances permitting and authorizing the parallel acts and omissions,

17   benefitted from and ratified the improper behavior, therefore becoming jointly and severally liable.

      72.    Plaintiffs are informed and believe, and thereon allege, that

18           i.    WELLS FARGO and its affiliates are liable (to the extent provided in this

19                 Complaint) for all wrongful acts relating to their acquired business as the successor-

20                 in-interest to the mortgage lending business of certain other Defendants,

21          ii.    Defendant directly and through its subsidiaries and other agents sued herein as

22                 DOES have continued the unlawful mortgage lending and collection practices,

23                 including, without limitation, writing fraudulent mortgage as set forth above and

24                 concealing prior wrongful acts that occurred in whole or in part,

25         iii.    Defendant and their subsidiaries are jointly and severally liable as alter egos and as a

26                 single, greater unified whole

- 74 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

27

iv. the purpose of this scheme is Defendants, and each of them, quest for taking money and property of Plaintiffs without due process, wrongfully, fraudulently, unfairly and in violation of law.

73.     Defendants in the action are all agents, predecessors-in-interest, or otherwise controlled by Defendants WELLS BANK and WELLS HOME, that may be collectively referred to as "the WELLS Defendants" or "Defendants."

**COMMON ALLEGATIONS**
INFLATED PROPERTY VALUES, PREDATORY LENDING,
BREACH OF CONTRACT, AND SECURITIZATION

**WELLS FARGO BANK, NA, WELLS FARGO HOME MORTGAGE,
AND WELLS FARGO HOME MORTGAGE LLC AS SUCCESSORS IN INTEREST
TO WACHOVIA CORP, GOLDEN WEST, AND WORLD SAVINGS**

74.     In October 2006, WACHOVIA CORP. reportedly paid twenty-four billion dollars ($24,000,000,000) for the acquisition of the Oakland, California based GOLDEN WEST FINANCIAL CORP (GOLDEN WEST), owner of WORLD SAVINGS BANK FSB ("WORLD SAVINGS"). In 2008 WELLS FARGO BANK, NA reportedly purchased WACHOVIA CORP for fifteen billion, one-hundred million dollars ($15,100,000,000) assuming both the assets and obligations of WACHOVIA CORP, GOLDEN WEST, and WORLD SAVINGS. Plaintiffs allege that WORLD SAVINGS was the nation's second-largest savings and loan and that WORLD SAVINGS and WACHOVIA CORP were two of the leading participates in the above described scheme.

75.     Plaintiffs allege that Defendant WELLS had full knowledge of the deceptive business practices and fraud perpetrated by WACHOVIA CORP, GOLDEN WEST, and WORLD SAVINGS when WELLS purchased WACHOVIA CORP in 2008. Plaintiffs allege that Defendant WELLS FARGO knew of the deceptive and fraudulent practices involved in the origination of the mortgages it now services including inflated appraisals and the selling of predatory loans to securitized trusts. Plaintiffs allege that Defendant WELLS was a party to this brazen scheme to inflate property values on a massive country-wide scale, to unfairly compete with legitimate mortgage providers, and to engage in securities and tax fraud as well as fraudulent concealment of the true nature of Plaintiffs' loans.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

76.     Plaintiffs allege that from as early as 2004, the senior management of Defendants' mortgage lending business perpetrated this scheme with full knowledge that it would devastate Plaintiffs' home values and net worth and cause Plaintiffs to be locked into paying loans that were far in excess of their property's value. Plaintiffs allege that Defendants nevertheless perpetrated their scheme to secure their profits (and Plaintiffs' losses) for as long as they could before property values turned sharply down and Defendants began foreclosing.

77.     While subprime loans were marketed as a way in which less credit worthy persons could purchase a home, the Plaintiffs herein are informed, believe, and thereupon allege that the true purpose and intent on the part of WELLS and WACHOVIA CORP in marketing and selling such risky loans, was to reap the much higher profits that could be realized from the origination and resale via "securitization" – i.e. the bundling of loans and selling such bundled loans as single investment assets on the secondary market – of such loans. Plaintiffs are informed, believe, and thereupon allege that this caused Defendant to induce credit-worthy individuals prepared to put down ten percent (10%) of the purchase price (such as with plaintiffs *Farrah Pirahanchi* and *Monireh Bozorgi*   or even twenty-percent (20%) of the purchase price (such as plaintiffs *Farrah Pirahanchi, Monireh Bozorgi* ————————————————————as well as those with sufficient equity in their house, ~~Farrah Pirahanchi, Monireh Bozorgi~~ to unnecessarily encumber themselves with these risky, high-cost loans.

78.     Plaintiffs are informed, believe, and thereupon allege that the subprime loans marketed and sold by WACHOVIA, WELLS, and their affiliates were not only egregious with respect to the certainty of default on those loans, but were also deviously designed, as these Defendant loan originators sought to cut off any liability for such unconscionable loans by immediately bundling those loans and selling them to investors, such as mutual funds and retirement funds, who would be immune to defenses that the borrowers would have otherwise had against the Defendant originators as holders in due course. Plaintiffs allege that at the same time, all the Defendants, and each of them, sought to further wrongfully profit from their illegal and fraudulent acts by collecting fees for servicing the very loans they had so quickly tried to sell to investors. Plaintiffs allege that by assigning these subprime loans to their subsidiary or affiliate loan "servicers," Defendant originators retained a measure of control

- 76 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

over the loans they had sold, including the power of foreclosure, while minimizing their exposure to liability for such predatory subprime loans.

79.     Plaintiffs are informed, believe, and thereupon allege that Defendants breached their own contracts, as well as general contract law, by not providing Plaintiffs with copies of their DEEDS OF TRUST immediately after signing, or within a few days as required by law so that Plaintiffs would have the opportunity to review the contract and back out.

80.     Plaintiffs are informed, believe, and thereupon allege that Defendants delayed delivery of executed contracts so as to deny Plaintiffs the timely right, and therefore any meaningful right, to review these contracts and back out if the terms were not as agreed to.  Defendants thereby breached their own contracts, as well as a statutory duty of lenders to inform borrowers of their right to cancel certain real property contracts.

81.     Plaintiffs are informed, believe, and thereupon allege that Defendants fraudulently forced them to consolidate car loans and credit card debt in order to "qualify" for loans and that this added unnecessary debt to their secured DEEDS OF TRUST.

82.     The federal TRUTH IN LENDING ACT ("TILA") gives consumers a seventy-two (72) hour protection known as "the Cooling-Off Rule" which allows borrowers to cancel a home-improvement loan, or a second DEED OF TRUST within seventy-two (72) hours. TILA requires a lender to inform borrowers of their right to cancel and to provide a cancellation form. (**SITE**)

83.     Plaintiffs allege that Defendants incited agents to push predatory negative amortization ("neg-am") loans by offering financial incentive to agents that then "sold" these high-risk, high-cost loans to Plaintiffs.  Plaintiffs are informed, believe, and thereupon allege that the financial incentive to sell these loans caused agents to falsify income reports, credit reports, and real property appraisals. Plaintiffs are informed, believe, and thereupon allege that Defendants' agents were induced to lie to borrowers about their credit-worthiness in order to trick Plaintiffs into high-risk, high-cost loans, even when Plaintiffs had good jobs, a good credit rating, and over twenty (20) or sometime thirty (30) percent of the purchase price to put down as a deposit.  Plaintiffs allege that Defendants' policy of doing this is designed to induce borrowers into default and foreclosure and is therefore a violation of the spirit, as well as the specific intent of the TRUTH IN LENDING ACT.

- 77 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

84.    TILA requires lenders to disclose in writing all loan fees and charges to borrowers as well as the annual percentage rate they will be charged, in writing before they enter into a DEED OF TRUST secured by real property.  TILA also bars Mortgage Lenders from extending high-cost loans to consumers that are likely to default on their loans as determined by their assets and liabilities.  (**SITE**)

85.    All Plaintiffs are informed, believe and thereupon allege that the purchase mortgage on the property, the debt or obligation evidenced by the NOTE and the DEED OF TRUST executed by Plaintiff in favor of the original lender and other Defendants, regarding the Property, was not properly assigned and transferred to Defendants operating the pooled mortgage funds or Trusts in accordance with the PSA of the entities making and receiving the purported ASSIGNMENTS to this trust. Plaintiffs allege that the PSA requires that each NOTE or DEED OF TRUST had to be endorsed and assigned, respectively, to the trust and executed by multiple intervening parties before it reached the Trust and that neither the NOTE nor the DEED OF TRUST were assigned to the Securitized Trust by the closing date.  Therefore, under the PSA, any assignments of the DEED OF TRUST, beyond the specified closing date for the Trust are void.

86.    Plaintiffs are informed, believe and thereupon allege that at the time of entering into the NOTES and DEEDS OF TRUST referenced herein with respect to each Plaintiff, each Defendant originating or participating in the origination of a mortgages and each Defendant servicing the foregoing mortgages and the successors to each of the foregoing (collectively, the "Defendants") was bound and obligated to fully and accurately disclose to each borrower, including each Plaintiff herein, that the mortgage being offered to the Plaintiffs was, in fact, part of a massive fraud that Defendants knew would result in a loss of Plaintiffs' equity investment in a severe impairment of Plaintiffs' credit ratings. Pursuant to this scheme Plaintiffs thereupon allege that Defendants, were bound and obligated to fully and accurately disclose:

      i.    Who the true lender and mortgagee were.

      ii.    That to induce a Plaintiff to enter into the mortgage, Defendants caused the appraised value of Plaintiff's property to be overstated.

      iii.    That the over-valuation of homes by Defendants was community and country wide.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

iv. That to induce a Plaintiff to enter into a mortgage, Defendants disregarded underwriting standards, thereby causing Plaintiff to falsely believe that Plaintiff was financially capable of performing Plaintiff's obligations under the mortgage (qualified), when Defendants knew this was untrue.

v. That Defendants had the right to securitize and sell Plaintiffs' mortgages to third-party investors, and especially that that Defendant specifically *planned and intended* to sell virtually all mortgages to securitized trusts at highly-inflated and unsustainable values.

vi. That Defendants would not disclose Plaintiffs' true financial condition or the true value of Plaintiff's home and mortgage to investors to whom the mortgage would be sold;

vii. That Defendants intended to sell the mortgage together with other mortgages as to which it also intended not to disclose the true financial condition of the borrowers or the true value of their homes or mortgages;

viii. That the consideration Defendants sought from investors would be greater than the actual value of Plaintiffs' NOTES and DEEDS OF TRUST; and that this was part of a scheme by which Defendants would bilk investors by selling collateralized mortgage pools at an inflated value.

ix. That the consideration Defendants sought from investors would be greater than the income stream that could be generated from Plaintiffs' instruments even assuming a 0% default rate thereon.

x. That Defendants knew, at the time they did the foregoing, that it would lead to a liquidity crisis and the collapse of the enterprise;

xi. That Defendants knew their scheme would damage each Plaintiff's property value and thereby result in the loss of Plaintiff's equity as well as damaging Plaintiff's credit rating, thereby causing Plaintiffs additional financial damage; and

- 79 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

xii. That Defendants knew at the time of making each loan, but did not disclose to Plaintiffs, that entire communities would become "ghost-town-foreclosure-communities" after a domino effect of foreclosures hit them.

87.     Plaintiffs are informed, believe and thereupon allege that from 2008 to the present, Defendants' enterprise systematically destroyed California home values and California's home values decreased by considerably more than most other areas in the United State as a direct and proximate result of the Defendants' enterprise scheme set forth herein.  Plaintiffs allege that what started in California ultimately spread across the entire Country.  Plaintiffs are informed, believe and thereupon allege that Defendants knew that the scale of their predatory lending, based as it was on inflated property values, without income verification and in violation of numerous underwriting guidelines, would lead to widespread declines in property values, thereby further harming Plaintiffs.  Plaintiffs allege that as a result these fraudulent actions of Defendants, they lost their equity in their homes, suffered damaged credit ratings and histories, and incurred material other costs and expenses described herein.

88.     Plaintiffs are informed, believe and thereupon allege that Defendants knew of the fraud of their predecessors in interest having carefully investigating the assets they were acquiring, interviewing executive of the enterprise, and forming their own vehicles to execute the plan and therefore cannot improve their position with regard to Plaintiffs' defenses and must stand in the shoes of these predecessors.

89.     Plaintiffs are informed, believe and thereupon allege that Defendants' scheme included violation of their own underwriting guidelines to covertly induce Plaintiffs and others to enter into loans at a loan-to-value ratio that was unsustainable.  Plaintiffs are informed, believe and thereupon allege that Defendants did this without income verification. Plaintiffs are informed, believe and thereupon allege that Defendants induced Plaintiffs into mortgages with changing interest rates where Defendant knew that Plaintiffs would only be able to afford the introductory discounted interest rate and that soon the loan would become unaffordable.  Plaintiffs are informed, believe and thereupon allege that Defendants induced them in this way into "Pick-a-Pay" loans where Plaintiffs' principle increased with each minimum payment making it impossible for Plaintiffs to ever refinance.  Plaintiffs are informed, believe

- 80 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

and thereupon allege that Defendants schemes caused a situation whereby Plaintiffs were doing little more than paying rent to the lender for the use of their home except that Plaintiffs were also absorbing the costs of taxes, insurance, and maintenance of what would eventually revert to being the lender's property.

90.     Plaintiffs are informed, believe and thereupon allege that Defendants knew that when interest payments increased and balloon payments became due, if not before, Plaintiffs and others would begin defaulting on their mortgages and would suffer financial, emotional, and psychological losses associated with the loss of a home.  Plaintiffs are informed, believe and thereupon allege that Defendants knew of the pain they were causing by their deception and nonetheless sought to exploit Plaintiffs for their own gain.

91.     Plaintiffs are informed, believe and thereupon allege that Defendants concealment of the aforementioned fraudulent scheme from borrowers and investors was absolutely essential because the enterprise knew it would soon be delivering Plaintiffs' NOTES and DEEDS OF TRUST to investors and their representatives at intentionally inflated values as collateral for Defendants' fraudulent securitized trusts.

92.     Plaintiffs are informed, believe and thereupon allege that Defendants caused to be recorded in the public records false and fraudulent misrepresentations, sometimes through the use of MERS, that concealed the material facts of Plaintiffs' loans from investors and borrowers.

93.     Plaintiffs are informed, believe and thereupon allege that Defendants' acts involve securities fraud in that Defendants affirmatively misrepresented its underwriting processes, the value of its mortgages and the fundamental nature of its business model in its press releases, annual report and securities filings, all of which were widely distributed to the public, including Plaintiffs.

94.     Plaintiffs are informed, believe and thereupon allege that Defendants intended Plaintiffs, to rely upon its misrepresentations and made those misrepresentations to create false confidence in Defendants and to further its fraud on borrowers and investors.  Plaintiffs are informed, believe and thereupon allege that Plaintiffs would never have done business with Defendants or entered into mortgages with Defendant if the true nature of the scheme had been disclosed to them.

- 81 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

95.     Plaintiffs are informed, believe and thereupon allege that if they had later learned the truth, each Plaintiff would have either

    i.   rescinded the loan transaction under applicable law and/or

    ii.  refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.

96.     Plaintiffs are informed, believe and thereupon allege that they reasonably relied on the deceptions of Defendants in originating their loans and failing to exercise their rights to rescind or refinance.

97.     Plaintiffs are informed, believe and thereupon allege that after entering into the transactions with each Plaintiff herein as alleged herein, Defendants (purportedly) sold the NOTES and DEEDS OF TRUST pertaining to Plaintiffs' properties in securities transactions. The sales included and involved:

    i.   sales to nominees who were not authorized under law at the time to own a mortgage, including, among others, MERS;

    ii.  misrepresentations to investors and concealment from investors of the true value of Plaintiff's home and mortgage; and the true value of the loans included in the pools;

    iii. misrepresentations to investors and concealment from investors of the true financial condition of Plaintiffs and other borrowers and their ability to pay their loans;

    iv.  consideration that was greater than the actual value of the (purported) NOTES and DEEDS OF TRUST;

    v.   consideration greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon; and

    vi. a scheme by which the enterprise bilked investors by selling collateralized mortgage pools at an inflated value.

98.     Plaintiffs are informed, believe and thereupon allege that as a proximate and foreseeable result of the (purported) sale of their NOTES and DEEDS OF TRUST for more than the actual value of such instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in accordance with their indentures.

- 82 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

99.     Plaintiffs are informed, believe, and thereupon allege that Defendants continually assigned Plaintiffs' loans to new lenders without NOTICE thereby denying Plaintiffs' right to seek another lender if the assignee was not acceptable.  This lack of NOTICE affected every Plaintiff herein, often repeatedly.  Plaintiffs allege an industry-wide pattern of violation.

100.    Plaintiffs are informed, believe, and thereupon allege that their loans were sold to Securitized Real Estate Investment Trusts (REIT) without their knowledge and without NOTICE in violation of RESPA 12 USC §2605.

101.    According to RESPA 12 USC §2605, subtitled "SERVICING OF MORTGAGE LOANS AND ADMINISTRATION OF ESCROW ACCOUNTS," whenever a loan is assigned to a new assignee, borrowers must be given written notice of that transfer fifteen (15) days before the effective date of transfer.

> 12 USC §2605(c)(2)(A) states in relevant part:
> "Except as provided in subparagraphs (B) and (C), the notice required under paragraph (1) shall be made to the borrower not more than 15 days after the effective date of transfer of the servicing of the mortgage loan (with respect to which such notice is made)."

102.    Plaintiffs allege that they were further denied NOTICE when their loans were "table funded," whereby the purported lender was a broker, so that the named lender/ beneficiary on the DEED OF TRUST was a broker and not the actual initiator of the loan.[4]  Prior NOTICE of change of beneficiary was not given to Plaintiffs in these "table funding" scenarios and neither was subsequent NOTICE except for a first statement or bill that came from the new lender (Defendants).

103.    Plaintiffs are informed, believe and thereupon allege that there has been considerable press attention and litigation in the United States Bankruptcy Courts and state courts establishing that in many instances Defendants do not have in their possession the original or an authentic copy of the promissory NOTES with respect to the loans they originated and/or purport to service. Based thereon, based on other litigation of which counsel to Plaintiffs are aware, and based upon Plaintiffs interactions with Defendants, on information and belief, Plaintiffs hereby allege that Defendants have made demand

---

[4] Table funding ...

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1  for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are

2  incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory

3  NOTES Defendants are purportedly servicing.

### FRAUDULENT USE OF MERS
### VIOLATION OF RECORDING STATUTES
### VIOLATION OF PATRIOT ACT

6      104.    Plaintiffs FARRAH Pirahanchi, Moniveh Bozorgi

7

8

9  [43] allege that they executed a series of documents, including but not limited to a NOTE and DEED OF

10  TRUST securing the Property in the amount of the NOTE and that the original beneficiary on the DEED

11  OF TRUST was MERS or MERS was named as beneficiary or nominee of Plaintiffs' DEED OF

12  TRUST even though MERS was not authorized under law to own a DEED OF TRUST.

13      105.    Plaintiffs are informed, believe and thereupon allege that MERS has been used to

14  facilitate the unlawful transfers of mortgages, unlawful pooling of mortgages and the injection into the

15  United States banking industry of un-sourced (i.e., unknown) funds, including, without limitation,

16  improper off-shore funds.

17      106.    Plaintiffs are informed and thereon believe that MERS has been listed as beneficial

   owner of more than half the mortgages in the United States.

18      107.    In 2001, Congress found that "money laundering, and the defects in financial

19  transparency on which money launderers rely, are critical to the financing of global terrorism and the

20  provision of funds for terrorist attacks." Congress specifically found that "money launderers subvert

21  legitimate financial mechanisms and banking relationships by using them as protective covering for the

22  movement of criminal proceeds and the financing of crime and terrorism..."

23      108.    Plaintiffs are informed, believe and thereupon allege that during periods relevant to the

24  other acts complained of in this Complaint, Defendants:

25          i.    did not establish due diligence policies, procedures and controls reasonably designed

26              to detect and report instances of money laundering,

- 84 -

27  **PLAINTIFFS' COMPLAINT FOR DAMAGES**

    ii.  did not establish procedures to take reasonable and practicable measures to verify the identity of those applying for an account with the institution and maintain records of the information used to verify a person's identity, including name, address, and other identifying information,

    iii.  did not determine and report the sources of funds used for the mortgages they originate and service, as well as the source of funds used to acquire any mortgages, or

    iv.  did not disclose to Plaintiffs the identities, address and telephone numbers of transferees of their mortgages.

109.    Plaintiffs are informed, believe and thereupon allege that the foregoing is indicative of the Defendants' bad acts. Those bad acts include, but are not limited to, wanton violations of the Patriot Act.

110.    Plaintiffs are informed, believe and thereupon allege that by the foregoing acts, Defendants are intentionally making it difficult or impossible for victims of Defendants' massive mortgage fraud and statutory violations to enforce their rights. Plaintiffs allege that Defendants have violated recording statutes by causing to be recorded into the county records fraudulent Due Diligence Declarations signed by robo-signers, as well as other fraudulent documents that have intentionally frustrated Plaintiffs attempts to learn about their mortgages and rights. Plaintiffs are informed, believe and thereupon allege that this is all in furtherance of Defendants' scheme to profit from the misery of the Plaintiffs.

111.    Plaintiffs are informed, believe and thereupon allege that the Defendants have intentionally violated California Civil Code §2923.5 which was designed to provide borrowers with information about loan modification, and that Defendants have fraudulently recorded statements of compliance with this statute in order to further deprive Plaintiffs of their rights.

112.    Plaintiffs are informed, believe, and thereupon allege that there has been considerable press attention, litigation and pending governmental investigations establishing, among other things, that in many instances the Defendants herein do not have in their possession, custody, or control the original, or an authentic copy of, the promissory NOTES of Plaintiffs. Plaintiffs are informed, believe, and

- 85 -

thereupon allege that Defendants have made demand for payment from Plaintiffs with respect to Plaintiffs' properties at a time when Defendants cannot establishing (and do not have any credible knowledge regarding) possession of the promissory NOTES that Defendants are servicing.

113.    Plaintiffs are informed, believe, and thereupon allege that MERS operates an electronic registry designed to track servicing rights and the ownership of mortgages. Plaintiffs are informed, believe, and thereupon allege that MERS is sometimes named as the "nominee" or "beneficiary" of the DEED OF TRUST on behalf of unknown persons representing unidentified sources of money advanced by persons, in violation of law. When a loan is transferred among MERS members, MERS purports to simplify the process by avoiding the requirement to re-record liens and pay county recorder filing fees.

114.    Plaintiffs are informed, believe, and thereupon allege that Defendants utilize MERS by naming MERS as the Beneficiary or Trustee of the DEED OF TRUST which is secured by real property in order that DEEDS OF TRUST and other documents required to be recorded by lenders, investors, and loan servicers may be recorded in the county land records automatically which lowers costs for lenders and consumers by reducing county recording costs from real estate transfers and provides a central source of information and tracking for mortgage loans.

115.    Plaintiffs are informed, believe, and thereupon allege based upon published reports, including the MERS website, that MERS does not:

      i.   take applications for, underwrite or negotiate mortgage loans;

      ii.  make or originate mortgage loans to consumers;

      iii. extend credit to consumers;

      iv. service mortgage loans; or

      v.  invest in mortgage loans.

116.    Plaintiffs are informed and believe and thereon allege that foreclosure cases filed in Superior Courts around the country demonstrate many of the ways in which MERS also committed deceptive trade practices. In a Delaware Superior Court, MERS foreclosed on a loan in which it had no interest and without naming the real party in interest. In addition, the entity upon whose behalf MERS sought to foreclose had actually been dissolved months prior. Moreover, MERS' own records indicate

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

numerous transfers in and out of MERS that are not reflected in the county records, as required by MERS' own rules. The confusing path and inaccurate records associated with this mortgage are not an isolated instance of bad recordkeeping by MERS. Rather, this type of confusion is endemic to the entire MERS System.

117.    Plaintiffs are informed and believe and thereon allege that MERS engaged and continues to engage in a range of deceptive trade practices that sow confusion among consumers, investors, and other stakeholders in the mortgage finance system, damage the integrity of Delaware's land records, and lead to unlawful foreclosure practices. MERS' deceptive trade practices fall into three broad categories.

i.   First, MERS, through its private mortgage registry, knowingly obscures important information from borrowers and the information that MERS does provide to borrowers is frequently inaccurate.

ii.  The opacity of MERS' mortgage registration database (the "MERS System") makes it difficult for stakeholders, such as consumers, to know of or challenge inaccuracies in the MERS System. When MERS foreclosed in its own name, MERS thus impaired a borrower's ability to raise defenses. The opacity of MERS' registry also frustrates the ability of borrowers to seek out the owner of their loan to pursue loan modifications or other loss mitigation relief in settlement of the mortgage.

iii. MERS often acts as an agent without authority from its proper principal. Because the MERS System is both unreliable and frequently inaccurate, MERS often does not know the identity of its proper principal. Where the name of the owner of the mortgage loan recorded in the MERS System does not reflect the true owner, any action MERS takes on behalf of the purported owner is without authority. For example, this may occur where a securitization vehicle is listed as the owner of mortgage loans in the MERS System, but the securitization vehicle does not in fact own the loans because the parties to the securitization transaction failed to properly transfer and assign the loans to the securitization vehicle.

iv.  MERS is effectively a "front" organization that has created a systemically important mortgage registry but fails to properly oversee that registry or enforce its own rules

- 87 -

PLAINTIFFS' COMPLAINT FOR DAMAGES

on the members that participate in the registry.  Rather than maintaining an adequate staff to provide MERS' services, MERS operates through a network of over 20,000 non-employee corporate officers who cause MERS to act without any meaningful oversight from anyone who works at MERS. Instead of meaningful internal controls, MERS relies on an "honor system" that fails to ensure the integrity of its registry. The lack of internal controls has resulted in MERS recording so-called "robo-signed" documents with country recorders of deeds, as well as MERS' failure to follow its own rules regarding proper institution of foreclosure proceedings.

118.    Plaintiffs are informed and believe and thereupon allege that on April 13, 2011, the Comptroller of the Currency along with the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, The Office of Thrift Supervision and the Federal Housing Finance Agency executed a Stipulation and Consent to the Issuance of a Consent Order ("Order") which resulted in a Cease and Desist Order being issued by those agencies requiring that MERS and its corporate parent, MERSCORP, take "all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices" that were identified as findings by the respective agencies during a systematic and in-depth review that "present financial, operational, compliance, legal and reputational risks" to MERS and MERSCORP as well as to those members such as Defendants who use the MERS services. [5]

119.    Plaintiffs are informed and believe and thereupon allege that among the findings reported in the Cease and Desist Order were that MERS has "failed to exercise appropriate oversight, management supervision and corporate governance" in order to "ensure proper administration and delivery of services." Moreover, the Order reports that the review revealed that MERS has "failed to establish and maintain adequate internal controls, policies and procedures, compliance risk management, and internal audit and reporting" in connection with its services to Defendants.

120.    Plaintiffs are informed and believe and thereupon allege that the twenty-two (22) page CEASE AND DESIST Order sets out detailed action plans on a specified time-line with reporting requirements intended to ensure that "at a minimum" MERS is operated "in a safe and sound manner in

[5] Stipulation and Consent to the Issuance of a Consent Order.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

accordance with applicable laws." Plaintiffs are informed and believe and thereupon allege that the CEASE AND DESIST Order is a strong validation of this Complaint in that it reports failures of management; compliance; inadequate training, skills, abilities and experience of personnel; failures of supervision by the board of directors and senior management; and process deficiencies such as registration and tracking systems as well as data integrity. Recognizing the liability issues such as those raised by Plaintiffs herein, the Order also insists that MERS undertake a review and make regular reports on "outstanding legal issues and pending litigation that affect the interests of MERS, MERSCORP, and Examined Members with respect to MERSCORP and MERS, and provides analysis and recommendations concerning litigation contingency reserves."

PREDATORY LOAN MODIFICATION
WRONGFUL FORECLOSURE
DUAL TRACKING

121.    Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein at length.

122.    Concerned with declining property values and the increasing principal balance due to the fraudulent increased market valves of homes, Plaintiffs have attempted to modify their respective home loans with Defendants. Plaintiffs are informed, believe, and thereupon allege that Defendants do not have authority to collect payments or to offer a modifications when Plaintiffs loans were securitized because the loans have been sold and transferred and the true owner of the NOTE is now unknown. Even if Defendants somehow do have authority to make modifications, the securitization process severely restricted Plaintiffs' ability to obtain a loan modification. This allegation is supported by the report published as document number WP 2011-02 by the Federal Reserve Bank of Chicago entitled "The Role of Securitization in Mortgage Renegotiation." This document states in part:

> we find that bank-held loans are 26% to 36% more likely to be renegotiated than comparable securitized mortgages (4.2 to 5.7% in absolute terms). Also, modifications of bank-held loans are more efficient: conditional on a modification, bank-held loans have lower post-modification default rates by 9% (3.5% in absolute

- 89 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

*terms). Our findings support the view that frictions introduced by securitization create a significant challenge to effective renegotiation of residential loans.*

129.     Plaintiffs are informed, believe, and thereupon allege that Defendants fraudulently induced Plaintiffs to be in arrears on their mortgage payments by at least three months in order to qualify for modification. **This promise was clear and unambiguous in its terms.** *Garcia v. World Savings, FSB* **(2010) 183 Cal.App.4th 1031, 1044**. Plaintiffs ˙ FARRAH Pirahanchi ˙ and Monireh Bosorgi ˙ were thereby induced to stop paying only to be told later when they called Defendant that they did not "qualify" for a loan modification. All Plaintiffs allege that this was fraudulent inducement to **get them to put themselves in an inferior position,** since the standards of what made a borrower eligible or ineligible for a modification (according to Defendant) were at all times known to Defendant. Plaintiffs allege that this had the effect of destroying their credit and precluding them from exploring other refinancing options. Plaintiffs allege that this exposed them to unnecessary late fees and penalties that Defendant continued to charge Plaintiffs despite the fact that it was Defendant that told Plaintiffs to stop paying. The fact that this was common practice by Defendants is supported by the following paragraph in a typical Pooling and Servicing Agreement entered into by Defendants with the Trust that had purchased Plaintiffs' loans:

> *"The Servicer shall not make any future advances to any obligor under any Mortgage Loan, and (unless the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Servicer, reasonably foreseeable) the Servicer shall not permit any modification of any material term of any Mortgage Loan, including any modification that would change the Mortgage Interest Rate, defer or forgive the payment of principal or interest, reduce or increase the outstanding principal balance (except for actual payments of principal) or change the final maturity date on such Mortgage Loan;"*

130.     Plaintiffs are informed, believe, and thereupon allege that they were induced by Defendants to rely on loan modification as an alternative to foreclosure. In reliance on this verbal commitment, Plaintiffs entered into forbearance agreement and/or did not make payments for a period of three (3) months or more with the promise of permanent modification and that the WELLS FARGO Defendants would not sell the properties at TRUSTEE'S SALE during the forbearance or modification period.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

140.    Plaintiffs are informed, believe, and thereupon allege that they followed every bit of Defendants instructions some for over three (3) years and that they have therefore been put into foreclosure proceedings unlawfully and fraudulently. Plaintiffs allege that because of Defendants' fraudulent representations Plaintiffs have been forced to hire attorneys and others in addition to the late fees and penalties, in order to enjoin Defendant from foreclosing.

141.    "Dual tracking" has been outlawed by the Comptroller of the Currency, a U.S. Treasury Division. John Welsh, together with The Office of Thrift Supervision, the Federal Reserve and the Federal Deposit Insurance Corp:

> "Going forward, banks may no longer simultaneously proceed with both loan modifications and foreclosures. That 'dual track' process resulted in many cases where homeowners who were making trial loan modification payments suddenly has their homes repossessed. Banks must establish a single point of contact-either one person or a team-for homeowners seeking assistance. Many struggling homeowners say they had Kafkaesque experiences over and over again, each time explaining their situation from scratch to a new bank representative. Banks must also develop plans for staffing, training and over-sight of outside firms. Banks' plans for correcting foreclosure problems will be supervised by bank regulators."

142.    Plaintiffs are informed, believe, and thereupon allege that, as part of the fraudulent practice of "dual tracking," Defendants continue to record and issue NOTICES OF DEFAULT in violation of California Civil Code § 2923.5. Plaintiffs allege that these violations of California Civil Code §2923.5 include recording NOTICES OF DEFAULT without making a Due Diligence attempt and/ or without recording a Due Diligence Declaration. Plaintiffs allege that Defendants have also filed false Due Diligence Declarations that signed by known robo-signers.

143.    California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or authorized agent may not file a NOTICE OF DEFAULT pursuant to California Civil Code § 2924 until thirty (30) days after initial contact is made as required therein, or thirty (30) days after satisfying the due diligence requirements to contact the mortgage described therein.

144.    Defendants violated the foregoing law by causing a NOTICE OF DEFAULT to be filed against Plaintiffs without the mandatory NOTICE. Defendants did not diligently endeavor to contact the

- 91 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1  Plaintiffs as required by § 2923.5(g) and Defendants thereby also violated California Civil Code §§

2  2923.5 and 2924.

3       145.    Despite the certainty that most of the subprime loans which were marketed and

4  originated by WACHOVIA and their affiliates would lead to default, Plaintiffs are informed, believe,

5  and thereupon allege that neither these loan originators, nor their affiliated loan servicers, including

6  WACHOVIA (following purchase of WACHOVIA CORP by WELLS) cooperated in remediating the

   detrimental effects of such loans through modification when the aforementioned borrowers inevitably

7  defaulted.

8       146.    Plaintiffs are informed, believe, and thereupon allege that Defendants compliance with

9  State and Federal loan modification programs has been minimal and illusory.  If initial or trial

10  modifications were offered, permanent modifications were either not offered, or were terminated

11  without NOTICE and without explanation by Defendants.  In contrast with their illusory compliance

12  with these State and Federal loan modification programs, Plaintiffs allege that Defendants, and each of

13  them, have been aggressively foreclosing on the borrowers they were given government money to help.

14  Plaintiffs allege that they have been doubly manipulated and deceived by being forced to go through a

15  degrading modification process that Defendants intend to use, and do use, as nothing more than a delay

16  tactic and a way to justify their TARP donations.  Plaintiffs allege that they have been strung along by

17  Defendants until they are too far behind on payments to ever catch up.  Plaintiffs allege that they have

   been lulled into a false sense of security by being "in process" with a loan modification while Defendant

18  has recorded NOTICES OF DEFAULT and NOTICE OF TRUSTEE'S SALE and aggressively

19  foreclosed upon them in secret (dual tracking).

20       147.    Plaintiffs are informed, believe, and thereupon allege that that the loan modifications

21  Defendant did offer them were just as predatory as Plaintiffs' original loan.  Defendants added missed

22  payments to the principle of the loan and extending the loan's duration.  Defendants gave favorable

23  interest rates for the initial period which then increased until borrowers ended up paying more than their

24  original loan or gave interest rate reductions without a principle reduction despite the fact of

25  Defendants' over-appraisals and the damages Plaintiffs suffered therefrom.  Plaintiffs allege that they

26  were induced into believing that a loan modification would be a better loan than their original loan when

- 92 -

27  **PLAINTIFFS' COMPLAINT FOR DAMAGES**

this was not so.  Plaintiffs allege that Defendants have simply continued to promote their own interests by foreclosing on the very borrowers whom they had set up to default in complete disregard of the taxpayer funds they had been given.  Plaintiffs allege that this is also in flagrant violation of California law and public policy to preserve home ownership (Cal. Civ. Code 2923.5, et seq.).

148.    Plaintiffs are informed, believe and thereupon allege that the business premise of the enterprise Defendants acquired was to victimize Plaintiffs, and other borrowers, while Defendants and their executives reaped huge salaries and bonuses and sold securities based on their inside information. Plaintiffs are informed, believe and thereupon allege that they are now forced to seek loan modifications from the very same investors that bought the overpriced mortgage pools from Defendants while Defendants continue to collect late fees and penalties without standing to do so.  Plaintiffs are informed, believe and thereupon allege that Defendants have in this way escaped responsibility for the massive fraudulent scheme they perpetrated and the disaster they knew would happen.

149.    Plaintiffs are informed, believe and thereupon allege that Defendants have mitigated their losses through TARP and other programs while Defendants use these funds to continue to aggressively profiteer from Plaintiffs via foreclosure.

150.    Plaintiffs are informed, believe and thereupon allege that the unraveling of the fraudulent scheme of Defendants has materially depressed the price of real estate throughout California, and the entire Country, including the real estate owned by Plaintiffs, resulting in the losses to Plaintiffs described herein. Plaintiffs are informed, believe and thereupon allege that it is precisely this loss of value on which Defendants now seek to capitalize by transferring a material portion of that wealth to themselves or those in collusion with them. Plaintiffs are informed, believe and thereupon allege that this scheme includes acquiring their real property at reduced values, collecting U.S. government money for paper losses, and harvesting the future increase on the value of these artificially depressed homes.

151.    Plaintiffs are informed, believe and thereupon allege that Defendants are continuing to profit from their fraud despite billions of dollars of taxpayer-funded relief programs.  Plaintiffs are informed, believe and thereupon allege that Defendants' current business model is to profit from decreased property values and the hardship this has caused Plaintiffs by seeking more government relief

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1  while they take fees, penalties, and fraudulent "trial modification payments" from Plaintiffs, only to

2  eventually take ownership of Plaintiffs' property through foreclosure.

3     152.    As a result of the foregoing unlawful conduct, Plaintiffs suffered further injury in fact by

4  the filing of notices of default and as such the Plaintiffs suffered monetary and property loss. Such

5  injuries and loss included diminished credit scores with a concomitant increase in borrowing costs and

6  diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs with

7  respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the

   ownership and possession of real property.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

**FIRST CAUSE OF ACTION**
Rescission – Mistake – Void Agreement
(By All Plaintiffs – Against All Defendants)

153.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

154.    The Restatement (Second) of Contract, §17 states: "the formation of a contract requires a bargain in which there is a manifestation of mutual assent…"  American Law Institute, Restatement (Second) of Contracts §17(1).

155.    The bargain between the parties is often referred to as the "meeting of the minds."  See, e.g. American Law Institute, Restatement (Second) of Contracts § 17, comment 2.

156.    The California Fourth District Appellate Court has held that a lack of "meeting of the minds," a mistake as to fact, can justify a rescission of the contract.  "A mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties, is subject to rescission by the party harmed. *Guthrie v. Times-Mirror Co.,* (1975) 51 Cal.App.3d 879.

157.    The mistake or missing of the minds does not have to be mutual.  A single party mistaken justifies the voiding or rescinding of the contract when the mistake is known to the non-mistaking party.

158.    The Restatement (Second) of Contracts, § 153 states:
"Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in §154, and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, (b) the other party had reason to know of the mistake or his fault caused the mistake."

159.    Plaintiffs are informed, believe, and thereupon allege that they executed their loan documents based on the mistaken belief that they would remain in a borrower/lender relationship.

160.    Plaintiffs are informed, believe, and thereupon allege that Defendants knew there would be no borrower/lender relationship.

- 95 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

161.    Plaintiffs are informed, believe, and thereupon allege that because of this mistake, the Plaintiffs' benefit from their loan agreements is far less than they thought they would receive.  Instead of a lender who had full authority to deal with the contractual relationship and the economic value to the lender, the Plaintiffs received a relationship with a party who lacked the full authority of the lender and lacked the economic incentive to modify the loan rather than foreclose.

162.    Plaintiffs are informed, believe, and thereupon allege that they further lost the right to even know who had the right to collect on their NOTE and to foreclose since securitization and the use of MERS makes it impossible to determine who their "lender" even is.

163.    Plaintiffs are informed, believe, and thereupon allege that the mistake was not a future contingency, but a reality present at the contract formation: that Defendants knew the securitization of the conduit loans would occur with certainty, that Defendants knew no borrower/lender relationship was contemplated, and that Defendant intended this to be a result of the loan.

164.    Plaintiffs are informed, believe, and thereupon allege that it would be unconscionable for the Defendants, having withheld material information regarding the loans from Plaintiffs, to still receive the benefits of the loans.

165.    Plaintiffs are informed, believe, and thereupon allege that it is illustrated by the WELLS FARGO publication attached herein and incorporated as Exhibit A, the Defendants know that the Plaintiffs did not understand the securitization of the loans would destroy the lender/borrower relationship.

166.    Based on the material mistake in the formation of their contracts, Plaintiffs allege that they are, therefore, entitled to an order of this Court rescinding the loans and/or declaring the loans void, invalid and unenforceable.

167.    In addition, Plaintiffs request restitution and damages in an amount not to exceed $75,000 each, the specific amount to be determined at trial.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

### SECOND CAUSE OF ACTION
**Fraudulent Inducement**
**(By All Plaintiffs – Against All Defendants)**

169.   Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

170.   Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessors in interest had exclusive knowledge not accessible to Plaintiffs of material facts pertaining to its mortgage lending activities that it did not disclose to Plaintiffs at the time it was entering into contracts with Plaintiffs. As more fully alleged herein, these facts included false appraisals, violation of underwriting guidelines, the intent to sell Plaintiffs' mortgages above their actual values to bilk investors and knowledge that the scheme would result in a liquidity crisis that would gravely damage Plaintiffs. Plaintiffs

170.   Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessors in interest, in connection with entering into contracts with Plaintiffs, made partial (though materially misleading) statements and other disclosures as to their prominence and underwriting standards in the public releases, on their web site, in their literature and at their branch offices.  Plaintiffs allege that Defendants' predecessors in interest suppressed material facts relating thereto as set forth above. Plaintiffs allege Defendants' predecessors in interest knew that the mortgages would be pooled, and securitized.

169.   Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessors in interest misled borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding the enterprise's loan products, including:

    i.   The increasingly lax underwriting guidelines used by the enterprise in originating loans;

    ii.   The enterprise's pursuit of a matching strategy by which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;

    iii.   The high percentage of loans the enterprise originated that were outside its own already lax underwriting guidelines due to loans made as exceptions to guidelines;

- 97 -

iv. The enterprise's definition of prime loans which included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;

v. The high percentage of the enterprise's subprime originations that had a loan-to-value ratio of 100%; and

vi. That the enterprise's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and loan-to-value ratios in excess of 95%.

170.    Plaintiffs allege that Plaintiffs did not know the concealed facts.

171.    Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessors in interest intended to deceive Plaintiffs. Plaintiffs allege that the deception was essential to their overall plan to bilk investors, trade on inside information and otherwise pump the value of the enterprise's stock.

172.    Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessor in interest was one of the nation's leading providers of mortgages. Plaintiffs allege that the enterprise was highly regarded by dint of its campaign of deception through securities filings, press releases, web site and branch offices and that the enterprise had acquired a reputation for performance and quality underwriting. Plaintiffs allege that, as a result of this, Plaintiffs reasonably relied upon the deception of the enterprise.

173.    Plaintiffs are informed, believe, and thereupon allege that the as a proximate result of the foregoing concealment by the enterprise, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

174.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants acquired the mortgages or rights related thereto with knowledge of the fraudulent operations of the enterprise.

175.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants can have no more rights in the mortgage assets than their predecessors, and therefore have no rights relating to Plaintiffs' realty as Defendants have represented to Plaintiffs that they have. Nonetheless, WELLS FARGO has continually concealed this fact from each Plaintiff while concurrently demanding and accepting debt service payments from each of the Plaintiffs throughout the past twelve months preceding the date of this complaint.

### THIRD CAUSE OF ACTION
#### Fraudulent Concealment
#### (By All Plaintiffs – Against All Defendants)

176.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

177.    Plaintiffs are informed, believe, and thereupon allege that the enterprise purchased by the WELLS FARGO Defendants also knew that within a foreseeable period, its investors would discover that the enterprise's mortgagors could not afford their loans and the result would be foreclosures and economic devastation.

178.    Plaintiffs are informed, believe, and thereupon allege that the enterprise purchased by the WELLS FARGO Defendants was more dependent than many of their competitors on selling loans it originated into the secondary mortgage market, an important fact it hid from the public. Plaintiffs allege that the enterprise knew the poor quality of the loans that the enterprise was writing, and expected the poor performance over time of those loans, and expected that this would ultimately curtail the enterprise's ability to sell those loans in the secondary mortgage market. Plaintiffs allege that these facts were hidden from Plaintiffs to their detriment.

179.    Plaintiffs are informed, believe, and thereupon allege that the enterprise knew the aforementioned negative information from numerous reports they regularly received and from emails and presentations prepared by the enterprise's chief credit risk officer. Plaintiffs allege that the

- 99 -

enterprise nevertheless hid this negative information from the public, including Plaintiffs to Plaintiffs' detriment.

180.    Plaintiffs allege that Plaintiffs did not know the concealed facts.

181.    Plaintiffs are informed, believe, and thereupon allege that the enterprise intended to deceive Plaintiffs. As described herein, that deception was essential to their overall plan to bilk investors, trade on inside information and otherwise pump the value of the enterprise's stock.

182.    Plaintiffs are informed, believe, and thereupon allege that property values across the United States of America precipitously declined prior to the WELLS FARGO Defendants acquiring the tainted mortgage assets and the property values continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residences, depriving them of access to equity lines, second mortgages and other financings previously available based upon ownership of their primary residences, in numerous instances leading to payments in excess of the value of their properties, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability

183.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants acquired the mortgages or rights related thereto with knowledge of the fraudulent operations of the enterprise.

184.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants can have no more rights in the mortgage assets than their predecessors, and therefore have no rights relating to Plaintiffs' realty as Defendants have represented to Plaintiffs that they have. Nonetheless, WELLS FARGO has continually concealed this fact from each Plaintiff while concurrently demanding and accepting debt service payments from each of the Plaintiffs throughout the past twelve months preceding the date of this complaint.

185.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants are currently professing willingness to modify Plaintiffs' loans in accordance with law while they nonetheless they persist to this day in continuing to offer Plaintiffs predatory loan modifications, and to execute their true plan to deprive Plaintiffs of their rights.

- 100 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

186.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages arising from this Cause of Action also include loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

187.    As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

188.    Plaintiffs are informed, believe, and thereupon allege that the enterprise's concealments as to the pervasive mortgage fraud, and the WELLS FARGO Defendants' concealments, both as to the their scheme to profiteer from the mortgage crisis and their scheme to accept U.S. government funds while purporting to offer loan modifications that will assist Plaintiffs, are substantial factors in causing the harm to Plaintiffs described in this Complaint.

189.    Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

190.    Inclusive of all compensatory damages, special damages, attorneys' fees and punitive damages alleged herein, each Plaintiff named herein has sustained damage in a sum of not greater than $70,000 per Plaintiff.

## FOURTH CAUSE OF ACTION
### Intentional Misrepresentation
### (By All Plaintiffs – Against All Defendants)

191.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

192.    Plaintiffs are informed, believe, and thereupon allege that Defendants' entire scheme was to sell loans to Plaintiffs and immediately sell these loans to a trust, transferring the risk to investors. Plaintiffs at all times were wrongly induced to believe they were entering a lender/ borrower relationship with a lender that would retain their loan.

- 101 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

193.    Plaintiffs are informed, believe, and thereupon allege that the campaign of concealment, misinformation and partial information described above in the INTRODUCTION, throughout the section captioned COMMON ALLEGATIONS, and in the First Cause of Action was intended to be and was repeated and broadly disseminated through the media, analyst reports and individual communications.  Plaintiffs allege that this misinformation was intended to be disseminated to homeowners and prospective homeowners seeking mortgages, and it was a factor in their home ownership and mortgage choices.  Plaintiffs allege that this campaign of misinformation and disinformation and the manifestation of this campaign described in the preceding paragraphs of this Third Cause of Action succeeded and caused harm to Plaintiffs.

194.    Plaintiffs are informed, believe, and thereupon allege that they relied upon the misrepresentations when they entered into mortgages with Defendants.  Plaintiffs allege that the misrepresentations were made with the intention that Plaintiffs rely on them.  Plaintiffs allege Defendants intended that Plaintiffs rely on the misrepresentations of Defendants so that Plaintiffs would come to a false understanding as to the nature of Defendants' business.  The foregoing misrepresentations were specifically intended to convince Plaintiffs to take mortgages from the WELLS FARGO Defendants.

195.    Plaintiffs allege that because of Defendants' prominence, Defendants' campaigns of deception as to their business plans, and the relationship of trust Defendants nurtured and developed between each of the Defendants and Plaintiffs, that Plaintiffs therefore were justified in relying upon Defendants' representations.  As a result of relying upon the foregoing misrepresentations, each Plaintiff entered into a mortgage contract with the Wells Fargo Defendants.

196.    Plaintiffs are informed, believe, and thereupon allege that the Defendants knew that the financial condition of WACHOVIA and WORLD SAVINGS was not sound, but Plaintiffs did not.  Plaintiffs allege that Defendants promised to refinance Plaintiffs' mortgages with fixed rate mortgages, but Defendants never intended to do so and did not do so.

197.    Plaintiffs are informed, believe, and thereupon allege that the as a result of the scheme described herein, Plaintiffs could not afford the mortgages when the variable rate features and/or balloon

- 102 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

payments kicked in and also could not refinance or sell their residence without suffering a loss of their equity investments.

198.   Plaintiffs are informed, believe, and thereupon allege that the as a result of the foregoing, Plaintiffs have lost all or a substantial portion of the equity invested in their properties and suffered reduced credit ratings and increased borrowing costs, among other damages described herein.

199.   Plaintiffs are informed, believe, and thereupon allege that Plaintiffs relied on the misrepresentations of Defendants' appraisers, that these misrepresentations were directed and ratified by the WELLS FARGO Defendants, and that this was a substantial factor in causing Plaintiffs' harm.

200.   Plaintiffs are informed, believe, and thereupon allege that after Defendants' scheme collapsed, Defendants represented to Plaintiffs that they would be assisted with a loan modification. Plaintiffs allege that as described herein, that representation was false.  Plaintiffs allege that Defendants knew that representation was false when they made it.

201.   Plaintiffs allege that because of new laws pertaining to loan modifications and Defendants insistence that they had a genuine interest in complying therewith and in keeping borrowers in their homes, Plaintiffs reasonably relied on the representations.

202.   Plaintiffs allege that by delaying Plaintiff from pursuing their rights and by increasing Plaintiffs' costs and the continuing erosion of each Plaintiffs credit rating, each Plaintiff's reliance harmed that Plaintiff.

203.   Plaintiffs *Faraah pirahanchi, Monireh Bozorgi,* _____

and thereupon allege that they were fraudulently induced into mortgages with a low introductory interest rate and a high later interest rate based on the promise that they could refinance for a better rate after one (1) or more years.  It was only later that Plaintiffs realized that a refinance could not be guaranteed and that this was a false promise.

204.   Plaintiffs are informed, believe, and thereupon allege that their damages arising from the matters complained of in this Cause of Action also include loss of equity in their properties, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs

- 103 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1    of credit, reduced availability of goods and services tied to credit ratings, increased costs of those

2    services, as well as fees and costs, including, without limitation, attorney's fees and costs.

3          205.    Plaintiffs allege that their reliance on the representations made by Defendants was a

4    substantial factor in causing Plaintiffs' harm.  Plaintiffs are entitled to such relief as is set forth in this

5    Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief

     which is by this reference incorporated herein.

6          206.    Inclusive of all compensatory damages, special damages, attorneys' fees and punitive

7    damages alleged herein, each Plaintiff named herein has sustained damage in a sum of not greater than

8    $70,000 per Plaintiff.

9          207.    Plaintiffs are informed, believe, and thereupon allege that consistent with discussions in

10   this action, Plaintiffs' counsel continues to survey Plaintiffs and potential Plaintiffs to collect

11   information regarding their reliance upon Defendants misrepresentations, Plaintiffs will seek leave to

12   amend to allege such supplemental allegations.

13                              **FIFTH CAUSE OF ACTION**
                                 **Negligent Misrepresentation**
14                        **(By All Plaintiffs - Against All Defendants)**

15         208.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as

16   though fully set forth herein.

17         209.    Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO

18   Defendants had no reasonable grounds for believing their fraudulent misrepresentations to be true at the

19   time they made them or instructed others to make them.  Plaintiffs allege that these misrepresentations,

20   as fully set forth in the Third Cause of Action and previous sections of this Complaint, were known at

21   all times to be false.

22         210.    Plaintiffs are informed, believe, and thereupon allege that Defendants intended that

23   Plaintiffs rely upon their misrepresentations.  As described herein, Plaintiffs reasonably relied on those

24   representations to their detriment.  By reason of Defendants' prominence and campaigns of deception as

25   to their business plans and the relationship of trust developed between each of the Defendants and

     Plaintiffs, Plaintiffs were justified in relying upon Defendants' representations.

26                                         **- 104 -**

27                        **PLAINTIFFS' COMPLAINT FOR DAMAGES**

211.    Plaintiffs are informed, believe, and thereupon allege that as a result of the relying upon the foregoing misrepresentations, each Plaintiff entered into a mortgage contract with the WELLS FARGO Defendants.

212.    Plaintiffs are informed, believe, and thereupon allege that as a result of Defendants' scheme described herein, Plaintiffs could not afford their mortgage when the variable rate features and/or balloon payments kicked in. Further, as a result of the WELLS FARGO scheme, Plaintiffs could not refinance or sell their property without supplying additional equity.

213.    Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include a loss of equity in their homes, costs and expenses related to refinance and loan modification, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and service tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorney's fees and costs.

214.    Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

215.    Inclusive of all compensatory damages, special damages, attorneys' fees and punitive damages alleged herein, each Plaintiff named herein has sustained damage in a sum of not greater than $70,000 per Plaintiff.

## SIXTH CAUSE OF ACTION
### Injunctive Relief for Violation of Cal. Civil Code § 2923.5
### (By All Plaintiffs – Against All Defendants)

216.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

217.    Pursuant to California Civil Code, §2923.5, the Defendants, and each of them, are prohibited by statute from recording a NOTICE OF DEFAULT against the primary residential property of any Californian without first making contact with that person as required under §2923.5 and then

- 105 -

PLAINTIFFS' COMPLAINT FOR DAMAGES

interacting with that person in the manner set forth in detail under §2923.5. An exception to this rule of law exists in the event the Defendants are unable with due diligence to contact the property owner.

218.    Pursuant to laws and ordinances in jurisdictions other than California, which laws or ordinances are similar to California Civil Code, §2923.5, whereby certain protections are afforded homeowner borrowers, the Defendants – and each of them – are prohibited by statute from recording a NOTICE OF DEFAULT and/or proceeding to institute or initiate foreclosure proceedings against the primary residential property of any homeowner without first making contact with that person as required, and then interacting with that person in the manner set forth in the specific statute or ordinance.

219.    With respect to all Plaintiffs in this cause of action, the realty that is the subject hereof was and is their primary residential dwelling.

220.    Plaintiffs are informed, believe, and thereupon allege that the Defendants, and each of them, caused NOTICES OF DEFAULT to be recorded against the primary residential properties of Plaintiffs Favrah Pirahanchi, Monèreh Bozorgi           , absent compliance with California Civil Code, §2923.5. Included in the noncompliance, Defendants, and each of them, caused declarations to be recorded in the public records against that were false and fraudulent. Plaintiffs allege that the limited protection Plaintiffs have as a borrower centers around the lenders' necessity to comply with recording and NOTICE statutes and that Defendants' disregard of these minimal protections afforded lenders is sometimes the only chance the court has to deal with multiple inequities that lenders have inured themselves to. Plaintiffs believe therefore that these violations should be punished harshly.

221.    The recording of a fraudulent declaration also violates § 2923.5 and other California laws precluding the recording of false statements. Plaintiffs

222.    Plaintiffs allege that the Defendants, and each of them, caused NOTICES OF DEFAULT to be recorded and/or initiated foreclosure proceedings against the primary residential properties of the Non-California Plaintiffs named in this cause of action absent compliance with State specific laws, statutes, or ordinances. Included in the noncompliance, Defendants, and each of them, caused declarations to be recorded in the public records that were false and fraudulent. This act also violates other laws precluding the recording of false statements.

- 106 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

223.    Plaintiffs are entitled to such injunctive relief based upon this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference is incorporated herein as though fully set forth at length.

### SEVENTH CAUSE OF ACTION
**Invasion of Constitutional Right to Privacy**
**(By All Plaintiffs - Against All Defendants)**

224.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

225.    The guarantee of privacy granted to each Californian is a special and unique right embedded in the very first clause of the California Constitution, Article I, §1 of the California Constitution which provides:

> "All people are by nature free and independent and have inalienable rights.   Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

226.    The unauthorized disclosure of "private information" (confidential, nonpublic personal information, including such information as social security numbers, dates of birth, property values, bank and credit card account numbers, and other personal information) is a fundamental violation of Californian's inalienable right to privacy.  Each Plaintiff has a Constitutional protected privacy interest and right in his or her Private Information.

227.    The average victim of unauthorized use of wrongfully disclosed personal confidential information spends approximately 600 hours and $1,400 repairing his or her credit once violated. Victims of identity theft also often suffer further financial loss from the denial of credit or utility services, increased difficulty in securing employment and housing, and higher insurance or credit rates. In some cases, an identity theft victim may even have a criminal record develop in his or her name. Further costs include lost wages or vacation time, diminished work performance, increased medical problems, and impact on family and friends. It is often the case that a victim will not discover that his or her Private Information has been stolen and misused until long after an identity theft had taken place, and then only when they are denied credit or discover that their bank account has been emptied.

228.    The California Constitution (Art. I, §1) is self-executing and confers a right of action beyond the scope of the mere common law tort. See, e.g., *Burt v. Orange* (2004) 120 Cal.App.4th 273, 284. Fundamental to privacy is the ability to control circulation of personal information. The proliferation of business records over which individuals have no control limits their ability to control their personal lives. Personal privacy is threatened by the information-gathering capabilities and activities of private business – and never more than when a financial institution that requires personal information to permit a consumer to buy a home and obtains it with the assertion and promise it will be safeguarded fails to safeguard that information.

229.    Plaintiffs are informed, believe, and thereupon allege that each Plaintiff provided Private Information to the Defendants as a requirement for obtaining a mortgage. Plaintiffs are informed, believe, and thereupon allege that each Plaintiff had a reasonable expectation that the Defendants would preserve the privacy of that Plaintiff's Private Information. Plaintiffs are informed, believe, and thereupon allege that Defendants directly and through their agents violated Plaintiffs' privacy rights by disclosing Plaintiffs' private information without their knowledge, authorization or consent.

230.    Plaintiffs are informed, believe, and thereupon allege that Defendants began running credit checks on their borrowers to determine who was experiencing financial difficulties. These credit checks were outsourced, meaning that private data was sent off-site with the goal to further develop information that could be used to further Defendants' fraud involving the sale of collateralized securities and also to improperly provide information to those who already had purchased such collateralized securities in order to give WELLS FARGO a tactical advantage ahead of other lenders. Social security numbers are among the most sought after and valuable items of personal information to an identify thief. Plaintiffs allege that this dissemination of their of personal confidential information, including their social security numbers, allowed criminals access to Plaintiffs' identifying information and exposed Plaintiffs to identity theft. Plaintiffs allege on information and belief that third parties unlawfully used the private information acquired from Wells Fargo thereby further damaging each Plaintiff. Plaintiffs are informed, believe, and thereupon allege that Defendants' actions have thereby wrongly exposed them to risk.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

231.    Plaintiffs are informed, believe, and thereupon allege that this unauthorized disclosure of private information is intrusive into the most private reaches of Plaintiffs' lives, and does not include information that is of a legitimate public concern.  Plaintiffs allege that by reason of the conduct alleged herein, Defendants violated each Plaintiff's constitutional right of privacy and, by unnecessarily exposing Plaintiffs' private financial information to the public, each Plaintiff has suffered special damages in an amount according to proof at trial.

232.    Plaintiffs are informed, believe, and thereupon allege that Defendants' further exposed Plaintiffs to risk of loss of their private information by the loan modification process that Defendants forced Plaintiffs to take part in.  Plaintiffs *Farrah Pirahanchi, Moniroh Bozorgi allege that their bank*

statements, pay stubs, tax returns and applications which inevitably included their social security numbers along with bank account numbers and other highly confidential information were repeatedly lost by Defendants.  Plaintiffs allege that the employees hired by Defendants to process loan modifications were not regular bank employees and that this work was often outsourced to other countries.  Plaintiffs are informed and believe that this process further exposed Plaintiffs to unnecessary risk.

233.    Further, as a proximate and foreseeable result of Defendants' intentional disclosure of Plaintiffs' private information, each Plaintiff has suffered general damages – including pain and suffering and emotional distress – in an amount according to proof at trial.

234.    Defendants conduct is willful, outrageous and pervasive, involving hundreds of thousands of California citizens and residents from other states.  Not only did Defendants abuse private information, willfully fail to protect or maintain the security of the private information, and then disclose it to third parties without permission, but they took no material steps to retrieve the private information and concealed the extent of the violations.

- 109 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

235.     Without limiting the damages as described elsewhere in this Complaint, Plaintiffs damages as a result of the foregoing also include direct losses associated with identify theft and the losses associated with reduced credit scores, including, among others, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitations, attorney's fees and costs.

236.     Plaintiffs allege that Defendants acted with actual malice by disclosing Plaintiffs' Private Information, failing to cure the same and concealing the magnitude of the problem.

237.     Plaintiffs are entitled to exemplary and punitive damages in the sum according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## EIGHTH CAUSE OF ACTION
### Violation of Business & Professions Code § 17200, et al.
### (By All Plaintiffs - Against All Defendants)

238.     Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

239.     Defendants' actions in implementing, perpetrating and then extending their fraudulent scheme of inducing Plaintiffs to purchase mortgages for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools while taking the Plaintiffs down-payments and costing Plaintiffs their equity in their homes and other damages, violates numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

240.     Plaintiffs are informed, believe, and thereupon allege that Defendants' predecessors in interest knew that Plaintiffs' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values. Plaintiffs allege that these pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pools created by the Defendants) constituted false credit reports victimizing Plaintiffs in the factual and legal manners set forth above.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

a.      The fraud of the enterprise also violated numerous state and federal laws as set forth above and thus constituted unfair competition under California law, for which restitution and injunction relief is mandatory; and

b.      Upon completion of sufficient discovery, Plaintiffs will seek leave to amend the complaint to supplement the foregoing allegations with respect to additional violations pertaining to specific Plaintiffs and additional patterns supporting Plaintiffs claims herein.

241.    Plaintiffs are informed, believe, and thereupon allege that the foregoing violations were in furtherance of the fraud perpetrated on Plaintiffs, that the enterprise could not have told the truth in their public filings without that truth becoming known to Plaintiffs, and that Defendants' false filings gave additional credence and support to omissions, concealment, promises and inducements by Defendants. Plaintiffs are informed, believe, and thereupon allege that Defendants knew of these violations of law in acquiring the tainted assets and operations of their predecessors in interest and still sought to enforce these mortgage obligations knowing they were wrongful.

242.    Plaintiffs are informed, believe, and thereupon allege that the forgoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act. Cal. Bus. & Prof. Code §§ 17200, 17500. Sections 17200 et seq. of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such —unlawful, unfair or fraudulent business act or practice.

243.    Plaintiffs are informed, believe, and thereupon allege that as a result of the actions, concealment and deceit described herein, each of the Plaintiffs has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs. Inclusive of all recoverable damages and restitution and costs and attorney's fees, each Plaintiff has sustained damage in the sum of ·· more than $70,000.

- 111 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

244.    Plaintiffs are informed, believe, and thereupon allege that as a further result of the actions, concealment and deceit described herein, each of the Plaintiffs has lost money or property as a result of such unfair competition.

245.    Plaintiffs are informed, believe, and thereupon allege that as a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, excessive fees paid at Defendants' demand, premiums received upon selling the mortgages at an inflated value and moneys received from government agencies for "losses" incurred by Defendants. As set forth above, these amounts (including damages if recoverable hereunder) are in the amount of    more than $70,000.

246.    Plaintiffs allege that they are also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale of NOTES and mortgages, or from any further acts of misconduct of the kind alleged herein.

247.    Plaintiffs are informed, believe, and thereupon allege that Defendants are also guilty of document fraud by "robo-signing." Plaintiffs are informed, believe, and thereupon allege that Defendants have routinely forged documents, or outsourced the work of forging documents, in order to cover up the fact that mortgage assignments from the original lenders to the securities companies and to the securitized trusts were never obtained. Plaintiffs allege that proper assignments were not made at the time in order that Defendants, and their predecessors in interest, could rush to securitize mortgages and thereby sell them to investors. Plaintiffs allege that now, years later when Defendants seek to foreclose on the borrowers that they over-appraised, induced into predatory loans, and otherwise profited from, there are no documents available to document the proper chain of title because none were originally created. Plaintiffs allege that Defendants have created these documents or have outsourced the document creation to other companies.

248.    Plaintiffs are informed, believe, and thereupon allege that among the documents fraudulently created by Defendants are the Due Diligence declarations that Defendants caused to be recorded with the county recorder.

- 112 -

249.   Plaintiffs are informed, believe, and thereupon allege that as a result of these fraudulently prepared and fraudulently recorded documents Plaintiffs have suffered in that those purported to have a perfected security interest in their DEEDS OF TRUST do not and are therefore foreclosing illegally.

250.   Plaintiffs are informed, believe, and thereupon allege that Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiff's, to third parties.  Plaintiffs allege that this false credit disclosure was critical to the success of Defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate the scheme.  The Defendants was aware that is true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end.  As a result, the Defendants repeated, reinforced, and embellished their false disclosures

251.   Plaintiffs are informed, believe, and thereupon allege that by violating Plaintiff's rights to privacy, and by misappropriating nonpublic personal information for their own use, Defendants thus wrongfully took Plaintiff's property interest in their private information and privacy and injured Plaintiffs.  Plaintiffs allege that, as a result, Plaintiffs are eligible for restitution because the Defendants wrongfully acquired the property in which Plaintiffs have an ownership or vested interest.

252.   The foregoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act. Cal. Bus. & Prof. Code §§ 17200, 17500.  Sections 17200 *et. seq.* of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such "unlawful,  unfair or fraudulent business act of practice.

253.   As a result of the actions, concealment and deceit described herein, the Plaintiff has suffered material financial injury in fact, including as described elsewhere in this Complaint, loss of equity in her home; costs and expenses related to protecting herself, reduced credit score,  unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings,

- 113 -

increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

254.    As a further result of the actions, concealment and deceit described herein, the Plaintiff has lost money or property as a result of such unfair competition, including the loss of Plaintiff's property interest in her Private Information as a result of the unconscionable invasion of privacy and misappropriation of nonpublic personal information.

255.    Plaintiffs are entitled to such equitable relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein as though fully set forth at length.

## NINTH CAUSE OF ACTION
### Breach of Contract
### (By All Plaintiffs – Against All Defendants)

256.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

257.    Plaintiffs are informed, believe, and thereupon allege that Defendants' acceptance of TARP money created an obligation to modify loans outstanding on Plaintiffs' real estate to the extent Defendants were pronouncing rights thereto, to assist borrowers, and to otherwise use the TARP funds for the benefit of, among others, the Plaintiffs herein.

258.    Plaintiffs are informed, believe, and thereupon allege that Plaintiffs are the intended third party beneficiaries of the contracts between the United States Government, certain intermediaries and the Defendants.

259.    Defendants, and each of them, breached their contractual obligations to Plaintiffs as set forth herein. Defendants further breached the contractual obligations owing to each Plaintiff in the manners alleged hereinabove.

260.    Plaintiffs are informed, believe, and thereupon allege that as a proximate and foreseeable result of said breaches of contract, Plaintiffs have been damaged in a sum according to proof, which – inclusive of all damages, costs, and attorneys' fees – is equal to or less than $70,000 for each Plaintiff herein.

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

261.     Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein as though fully set forth at length.

## TENTH CAUSE OF ACTION
### Slander of Title
### (By All Plaintiffs – Against All Defendants)

262.     Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

263.     Plaintiffs are owners in fee title to properties located in California.

264.     The WELLS FARGO Defendants willfully, wrongfully, and without justification and without privilege recorded NOTICES OF DEFAULT against Plaintiffs' properties.  This false recording of the NOTICES OF DEFAULT has caused doubt to be cast on Plaintiffs' title to the properties described herein and on the ability of Plaintiffs to pay for the monthly mortgage payments.  The recording of the aforementioned NOTICES OF DEFAULT has also directly impaired Plaintiffs' credit, financial credibility, and immediate sale ability of the properties and vendibility of the properties on the open market in an amount to conform the proof at the time of trial.

265.     Defendants were motivated by oppressions, fraud and malice, and therefore the awarding of exemplary and punitive damages are justified.

## ELEVENTH CAUSE OF ACTION
### Declaratory Relief
### (By All Plaintiffs – Against All Defendants)

387.     Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

388.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties.  See *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 606 (**actual controversy allegation accepted as true for demurer purposes**).

- 115 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

389.    Plaintiffs are informed, believe, and thereupon allege that Defendants do not have standing to foreclose on their property and that their loans are not in default.  Further, in the course of preparing the mortgages to be sold on Wall Street, Plaintiffs are informed, believe, and thereupon allege that Defendants (and their predecessors in interest) never assigned Plaintiffs' loans to their foreclosing bank or entity.

390.    Plaintiffs are informed, believe, and thereupon allege that Defendants have improperly prepared, separated, lost or destroyed, and then subsequently falsified the assignments of the NOTES thereby calling into question the validity of the expected interest in the security of the claimed NOTE holder(s). Thereby nullifying their ability to foreclose.

391.    Plaintiffs are informed, believe, and thereupon allege that Defendants' lack legal standing to conduct and enforce a non-judicial foreclosure as they are not the holders in due course of the NOTE.

392.    A party seeking to foreclose bears the burden of demonstrating standing and must plead its components with specificity and must demonstrate that it was the holder and owner of the NOTE and DEED OF TRUST as of the date of foreclosure.  As provided in California Commercial Code of Section 3302, a "holder in due course" means the holder of an instrument if both of the following apply:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) The holder took the instrument: (A) for value,  (B) in good faith, (C) without NOTICE that the instrument is overdue or has been dishonored of that there is an uncured default with respect to payment of another instrument issued as part of the same series, (D) without notice that the instrument contains an unauthorized signature or has been altered, (E) without NOTICE of any claim to the instrument described in [California Civil Code] Section 3306, and (F) without NOTICE that any party has a defense or claim in recoupment described in subdivision (a) of Section 3305.

393.    Plaintiffs are informed, believe, and thereupon allege that there have been numerous improprieties in the transfer of the DEED OF TRUST and appointment of the TRUSTEE in the handling

- 116 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

of their loan and that Defendant is not and does not represent the holder in due course of the NOTE and is not in possession of instruments granting the right, in due course, to enforce a non-judicial foreclosure. Further, the NOTES, if they exist at all, are not in default. Since the Defendants are not holders in due course and their foreclosure does not conform to the strict mandates of civil Code 2924, they do not have the legal authority or standing to foreclose.

394.    Plaintiffs are informed, believe, and thereupon allege that the securitization process severed the authority of the purported beneficiaries by transforming their mortgages into stocks and replacing beneficiaries with stockholders. The stockholders of a securitized trust have the right to collect contract payments via their stocks, but have no legal or equitable interest in any of Plaintiffs' real property. Because the securitized trust is insured against loss, these stockholders have not realized any loss or damages resulting from the purported default. Because the structure of securitization provides no investor (or holder) in due course that can claim default, there is no party with the right of foreclosure.

395.    Plaintiffs allege that Defendants have reaped tax benefits from selling their loans to the trust and are therefore

396.    Plaintiffs are informed, believe, and thereupon allege that there was not an actual assignment of their DEED OF TRUST to a new entity to establish the chain of title for the WELLS FARGO Defendants to foreclose. Plaintiffs are informed, believe, and thereupon allege that neither the WELLS Defendants, nor their predecessors in interest, complied with their own Pooling and Servicing Agreements or the REMIC Act (*also known as collateralized mortgage obligation* provisions of the IRS Tax Code).

397.    Plaintiffs are informed, believe, and thereupon allege that, pursuant to the terms of the PSA, the Mortgage Originator (i.e., the original lender herein) agreed to transfer and endorse to the Trustee for the Securitized Trust, without recourse, including all intervening transfers and assignments, all of its right, title and interest in and to the mortgage loan (NOTE) of Plaintiffs herein and all other mortgage loans identified in the PSA.

398.    Plaintiffs are further informed, believe, and thereupon allege that the PSA provides that the transfers and assignments are absolute, were made for valuable consideration, to wit, in exchange for the certificates described in the PSA, and were intended by the parties to be a bona fide or "True Sale."

- 117 -

1  Since, as alleged herein below, True Sales did not actually occur, Plaintiffs allege that the Defendant

2  Trustees are stopped and precluded from asserting any secured or unsecured claim in Plaintiffs cases.

3      399.    Plaintiff is further informed and believes, and thereupon alleges, that as a result of the

4  PSA and other documents signed under oath in relation thereto, the Mortgage Originator, sponsor, and

5  Depositor[6] are stopped from claiming any interest in the NOTE that is allegedly secured by the DEED

   OF TRUST on Plaintiffs' homes.

6      400.    Plaintiffs are informed and believe and thereupon allege that the NOTES in Plaintiffs'

7  cases were never actually transferred and delivered by the Mortgage Originator to the sponsor or to the

8  Depositor nor from the Depositor to the Trustee for the Securitized Trust. Plaintiffs further allege that

9  the PSAs that govern these Trusts provide that the Mortgage Files of the Mortgages were to be delivered

10 to the Trusts including Plaintiffs' DEEDS OF TRUST herein.

11     401.    Plaintiffs are informed and believe and thereupon allege that through securitization

12 audits of their homes and through discovery they will establish that the transfer of the NOTES and

13 DEEDS OF TRUST to a Pooling and Servicing Trust did not take place in the required 90 days of

14 opening and closing of the various trusts including, but not limited to, The Wells Fargo Mortgage

15 Backed Securities 2006-AR18 Trust, 2006-17 Trust, 2006-16 Trust, 2006-15 Trust, 2006-AR19 Trust,

16 2006-18 Trust, 2006-20 Trust, 2006-19 Trust, 2007-1 Trust, 2007-PA1 Trust, 2007-2 Trust, 2007-AR3

17 Trust, 2007-4 Trust, 2007-3 Trust, 2007-5 Trust, 2007-6 Trust, 2007-8 Trust, 2007-9 Trust, 2007-10

   Trust, 2007-11 Trust, and 2007-12 Trust ("various trusts").

18     402.    Plaintiffs are informed and believe and thereupon allege the WELLS FARGO

19 Defendants attempted years later to transfer the NOTES and DEEDS OF TRUST into the various trusts

20 and there is now a serious question of whether the lender and/or servicer ever owned the NOTE.

21 Plaintiffs are informed and believe and thereupon allege that they have been paying mortgage payments

22 to the wrong party who does not own or have a security interest in the NOTE and DEED OF TRUST.

23 [6] The Originator is the lender that originally funded the loan; the Sponsor
   "collects" or "buys" the loans from different lenders, combines them, and then

24 "sells" them to the Depositor; the Depositor "deposits" the loans into the
   Issuing Entity Trusts, and then, various bonds and certificates are sold; the

25 Issuing Entity would be the "legal owner" of the NOTES, though the actual
   documents would be held by Custodians.

26
                                    - 118 -
27              PLAINTIFFS' COMPLAINT FOR DAMAGES

403.    Plaintiffs are informed and believe and further allege that the NOTE and the DEED OF TRUST have been split causing a violation of the requirements of the owner of the NOTE to demonstrate its chain of title to that NOTE. *Carpenter v. Longman* 16 Walls. 271, 83 U.S. 271, 274. Based on the strict requirements of the PSAs involved in the securitization, Defendants could not have become the owners of the DEEDS OF TRUST and/ or Promissory NOTES, and thus Defendants do not have standing to foreclose.

404.    A judicial declaration is necessary and appropriate in this time and circumstances so that Plaintiffs may ascertain their rights and duties under the NOTES and DEEDS OF TRUST.

405.    As discussed more fully below, there are strong grounds to support Plaintiffs' instant allegation that there is an actual controversy about who owns Plaintiffs' NOTES and Defendants' standing to foreclose due to fraud, deceit, forgery, failed assignments and other fatal flaws in the chain of title caused when Defendants transferred Plaintiffs NOTES into a trust set up by Wall Street investors. Plaintiffs recite many of these specific reasons for the controversy and lack of Defendants standing to collect payments from Plaintiffs or to foreclose on their property in the common allegations above, and will provide further support below. This evidence will show that the WELLS FARGO Defendants never had, and do not have any authority over Plaintiffs' NOTE and property that secures payment of the NOTE.

406.    Based on the aforesaid "actual controversy" over Defendants' standing to foreclose and collect money on Plaintiffs' NOTE, a judicial declaration is necessary and appropriate at this time and in these circumstances so that Plaintiffs and Defendants may ascertain their respective rights and duties under the NOTES and DEEDS OF TRUST, if any.

407.    Moreover, Plaintiffs have an absolute right to preemptively challenge defendants' standing to foreclose by preemptively demanding examination of the chain of title. *Herrera v Deutsche Bank Nat'l Trust Co.* (2011) 196 CA4th 1366. Based on the foregoing discussion, this examination also appears to be mandated by federal and state constitutional due process protections, which demand an opportunity for a fair hearing before deprivation of such an important property right.

408.    Significantly, the United State District Court, S.D. California, recently held that a borrower cannot be denied declaratory relief to preemptively ascertain defendants' purported standing to

- 119 -

foreclose where there exists a controversy as to whether a fraudulent assignment of the NOTE or DEED occurred. The court also held that a Plaintiff can make a claim related to the loan's securitization if the improper procedures during the securitization are at issue. Here Plaintiff does not dispute the right to securitize her mortgage, but alleges that as a result of improper procedures the true owner of her mortgage is unclear and as a result she has been paying improper parties an excess amount. *Johnson v. HSBC Bank USA, et al.* 3:11-cv-2091-JM-WVG decided on **March 19, 2012.** See also, *Vogan v. Wells Fargo Bank, N.A.,* 2011 WL5826016 (E.D. Cal 2011)(holding it was improper to dismiss claims challenging defendants' standing to foreclose based on allegations that an assignment executed after the closing date of the securities pool created a plausible inference that at least some part of the recorded assignment was fabricated or otherwise invalid).

409.   Plaintiffs are informed, believe, and thereupon allege that MERS further clouds the issue of ownership and beneficiary rights regarding Plaintiffs' NOTES and DEEDS OF TRUST since MERS cannot be a real party in interest in a securitized mortgage. MERS' charter limits MERS' powers and duties to functioning as an electronic registry of (certain types of) securities therefore by its own corporate charter MERS lacks the authority to foreclose a mortgage, or to own or transfer an interest in a securitized mortgage. Also as an electronic registry MERS cannot physically transfer mortgage paper. Plaintiffs are informed, believe, and thereupon allege that pursuant to California law, to perfect the transfer of mortgage paper as collateral the owner should physically deliver the NOTE to the transferee. Without physical transfer, the sale of the NOTE is invalid as a fraudulent conveyance or as unperfected.

410.   Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants are strangers to the transaction and lack legal standing to conduct and enforce non-judicial foreclosures on Plaintiffs' properties because they are not the holders in due course of the NOTE. "The NOTE and the mortgage are inseparable, the former as essential, and the latter as an incident; assignment of a NOTE carries the mortgage with it, but the assignment of a mortgage alone is nullity." *Carpenter v. Longan* (1873) 83 U.S. 271, 274.

411.   Plaintiffs allege that their respective NOTES indentify the entity to whom they are payable, the original lender. Plaintiff allege that their NOTES cannot be transferred unless they are endorsed and the attachments to the NOTICES OF DEFAULT do not establish that endorsements were

- 120 -

made, nor are there any other NOTICES which establish that the original lender endorsed and sold the NOTE to another party. Defendants cannot show physical transfer of the NOTE to the transferee.

412. Plaintiffs are informed believe and further allege that in order to conduct a foreclosure action, a person or entity must have standing.

413. Plaintiffs' loans were passed through the MERS system from its inception. A recent California bankruptcy decision, In re Walker, Case no. 10-21656-E-11 (May 20, 2010), held that MERS could not foreclose because it was a mere nominee; and that as a result, plaintiff Citibank could not collect on its claim. The judge opined:

414. The court approvingly cited *In Re Vargas* (California Bankruptcy Court); *Landmark v. Kesler* (Kansas Supreme Court); *LaSalle Bank v. Lamy* (a New York case); and In *Re Foreclosure Cases* (the "Boyko" decision from Ohio Federal Court) and held: "Since the claimant, Citibank, has not established that it is the owner of the promissory NOTE secured by the DEED OF TRUST, Citibank is unable to assert a claim for payment in this case.

415. Plaintiffs are informed, believe, and thereupon allege that the WELLS FARGO Defendants have been collecting payments from Plaintiffs and are now trying to foreclose on Plaintiffs' home, claiming that they have the right to do so because they are the servicer of the trust that owns Plaintiffs' loan. However, Plaintiffs allege that a controversy exists as to whether "true sales" between 1) the Mortgage Originator, 2) the Sponsor, 3) the Depositor and 4) the Trust actually occurred as required by the PSA agreements, and therefore whether the loans and DEEDS OF TRUST ever got into the various trusts that the WELLS FARGO Defendants now service. Plaintiffs therefore allege that the WELLS FARGO Defendants have been unlawfully collecting Plaintiffs' loan payments and do not have standing to foreclose on Plaintiffs' home.

416. Plaintiffs are informed, believe, and thereupon allege that the chains of title to Plaintiffs' NOTES have been broken and the NOTES have been separated from the DEEDS OF TRUST, making Plaintiffs' loans unsecured. A seminal Supreme Court decision established the rule (followed by both the Ninth Circuit and California Courts), that an assignment of the promissory NOTE carries the mortgage or DEED OF TRUST with it, but not the reverse. See *Carpenter v. Longan*, (1873) 83 US 271 (NOTE and mortgage are inseparable, the former as essential and the latter as an incident;

- 121 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

assignment of the NOTE carries mortgages with it, but assignment of the mortgage alone is a nullity*);*
*Wolfe v. Leisure Time Sports, Inc.* (In re Leisure Time Sports, Inc.) (BAP 9th Cir 1996) 194 BR 859,
861 (security interest cannot exist, much less be transferred, independent of obligation that it secures; if
debt is not transferred, neither is security interest); *Kelly v. Upshaw*, (1952) 39 C2d 179, 192, 246, P2d
23 (assigning DEED OF TRUST without transferring promissory NOTE is completely ineffective).
These authorities flow from a fundamental recognition that the security interest has no reason to exist
independent of a secured obligation.

417.    Plaintiffs are informed, believe, and thereupon allege that because of document fraud
perpetrated by Defendants and their predecessors in interest Defendants can in no way be a holder in
due course with rights under the NOTE pursuant to California Commercial code §3302.  CCC §332
provides that a "holder in due course" means the holder of an instrument only if both of the following
apply:

> (1) The instrument when issued or negotiated to the holder does not bear such
> apparent evidence of forgery or alteration or is not otherwise so irregular or
> incomplete as to call into question its authenticity; and
>
> (2) The holder took the instrument: (A) for value,  (B) in good faith, (C) without
> notice that the instrument is overdue or has been dishonored of that there is an
> uncured default with respect to payment of another instrument issued as part of
> the same series, (D) without notice that the instrument contains an unauthorized
> signature or has been altered, (E) without notice of any claim to the instrument
> described in [California Civil Code] Section 3306, and (F) without notice that
> any party has a defense or claim in recoupment described in subdivision (a) of
> Section 3305.

418.    Plaintiffs are informed, believe, and thereupon allege that since Defendants are not
holders in due course and their foreclosure does not conform to the strict mandates of California Civil
Code §§2923.5, 2924, 2925c, 2924i, and 2932.5, they do not have the legal authority or standing to
foreclose.

419.    Plaintiffs are informed, believe, and thereupon allege that Defendants' attempts to
foreclose on Plaintiffs, along with Defendants (and their predecessors in interests') failure to properly
assign Plaintiffs' NOTES and DEEDS OF TRUST from the Mortgage Originator to the Sponsor to the

- 122 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1  Depositor to the Trust in compliance with the PSA agreement, has exposed Plaintiffs to double liability.

2  If a questionable assignee of an unsecured interest is permitted to enforce the security agreement it

3  unfairly expose Plaintiffs (the obligors) to double liability since the "holder in due course" of the NOTE

4  would also be entitled to recover from Plaintiffs (the obligors). The use of MERS as a beneficiary or

5  nominee with the power to make ASSIGNMENTS and SUBSTITUTIONS has further created a cloud

6  on Plaintiffs' titles, and further contributed to a situation where more than one party can now claim the

   right to foreclose.

7       420.    In *Dimock v. Emerald Properties* (81 Cal.App.4th 868), two separate parties attempted

8  to act as trustee at the same time. The court reversed a trustee sale by one of the trustees because the

9  trustee had previously been substituted for a different trustee. The court stated: "Our reading of the

10 statute is also consistent with practical necessity: there simply cannot be at any given time more than

11 one person with the power to conduct a sale under a DEED OF TRUST. We would create inestimable

12 levels of confusion, chaos, and litigation were we to permit a beneficiary to appoint multiple trustees,

13 each one retaining the power to sell a borrower's property."

14      421.    Further, Plaintiffs allege on information and belief that the NOTE, if it exists at all, is not

15 in default due to insurance coverage within the securitization scheme that protects the end purchasers of

16 mortgage-backed securities against losses if Plaintiffs failed to pay.

17      422.    Further Plaintiffs allege Defendants, along with the Wall Street investors they sold

18 Plaintiffs' loans to, have already benefitted by the securitization process and the ability to act without

   the hindrance of banking regulations and tax liability.  Plaintiffs allege that Defendants are engaging in

19 "Double Dipping" by receiving the benefits of the trust and its tax exempt status while at the same time

20 claiming the trust is still a mortgage. Plaintiffs allege that Defendants are attempting to claim that a

21 security (unsecured debt) and a mortgage (secured debt) exist simultaneously.

22      423.    Plaintiffs allege that an actual controversy has arisen and now exists between Plaintiffs

23 and Defendants concerning their respective rights and duties in regards to whether there is an effective

24 and enforceable DEED OF TRUST lien on Plaintiffs' homes.  Plaintiffs contend that Defendants lack

25 standing to foreclose on the properties because they do not have valid DEEDS OF TRUST since they

26 are not the holders in due course of the NOTES and are not acting under the authority of such holder(s).

- 123 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**

27

1    Further, an actual controversy has arisen and now exists between Plaintiffs and Defendants concerning

2    the latter's rights to foreclose and enforce a past DEED OF TRUST recorded on the property.

3         424.    Plaintiffs are informed, believe, and thereupon allege that the controversy complained of

4    arises from Defendants use of the so called "Securitization Process" where mortgages, DEEDS OF

5    TRUST, and NOTES were converted from an illiquid thirty (30) year mortgage into liquid certificates,

     bonds, or stocks. That process severed the authority of the holders in due course to take steps to avoid
6
     losses and the right of foreclosure. The securitization process converted holders in due course into
7
     owners of the right to collect contract payments without holding any legal or equitable interest in any of
8
     the securitized mortgages, stocks, bonds, or other derivatives. These "holders in due course" have not
9
     realized any loss or damages resulting from the purported default because the structure of securitization
10
     provided insurance to pay the monthly cash flow to the investor in the event of a default, so there is no
11
     investor or holder in due course to claim that a particular mortgage is in default. Since the Defendants
12
     are not holders in due course and their foreclosure does not conform to the strict mandates of Civil Code
13
     2924, they do not have the legal authority or standing to foreclose.

14        425.    Plaintiffs are informed, believe, and thereupon allege that they do not know with

15   certainty who is the true owner of their NOTES or the amount of payments that must be made and they

16   seek to clarify this issue. The fact that the endorsements may have been done by allonge when there was

     ample room on the face of the NOTE further calls into question the validity of the note. In *Pribus v.*
17
     *Bush*, (1981) 118 Cal.App.3d 1003, where an allonge was used when there was still room for
18
     endorsement on the NOTE; the court cancelled the NOTE and enjoined the foreclosure on the Plaintiff's
19
     property.

20        426.    Plaintiffs are informed, believe, and further allege that Defendants have improperly

21   prepared, separated, lost or destroyed, and then subsequently falsified the assignments of the NOTES

22   calling into question the validity of the expected interest in the security of the claimed NOTE holder(s)

23   thereby nullifying their ability to foreclose.

24        427.    Plaintiffs are informed, believe, and thereupon allege that Defendants, their predecessors

25   in interest, and their successors in interest have also not complied with their own PSAs or the REMIC

26   Act (also known as the collateralized mortgage obligation provisions) of the IRS Tax Code, both of

                                                     - 124 -
27   _____
                              **PLAINTIFFS' COMPLAINT FOR DAMAGES**

which govern the securitization of Plaintiffs' loans. Plaintiffs are informed and believe and thereupon allege there has *not* been an actual assignment of their DEEDS OF TRUST to a new entity to establish the chain of title to Defendants (and/ or their successors or predecessors in interest), that the strict requirements of the PSAs involved in the securitization have not been followed, and that Defendants (and/ or their successors or predecessors in interest) cannot be the owners of Plaintiffs' DEEDS OF TRUST or Promissory NOTES, and that Defendants (and/ or their successors or predecessors in interest) lack standing to foreclose.

428.    Plaintiffs are informed, believe, and thereupon allege that their loans were not transferred to the various trusts that are serviced by the WELLS FARGO Defendants, and therefore the Defendants have no right to collect loan payments from Plaintiffs and have no standing to foreclose on Plaintiffs' home. Plaintiffs are informed, believe, and thereupon allege that the true owner(s) of their loans are unknown to Plaintiffs. Plaintiffs allege that even if the WELLS FARGO Defendants could establish that the NOTES were transferred to the trusts within the close of the trust, the DEEDS OF TRUST have been separated from the notes, the substitutions of the trustees were fraudulent, and the assignment of the DEED OF TRUST to the WELLS FARGO Defendant is void. A judicial declaration is necessary and appropriate in this circumstance so that Plaintiffs may ascertain their rights and duties under the NOTES and DEEDS OF TRUST.

### TWELFTH CAUSE OF ACTION
**Promissory Estoppel**
**(By All Plaintiffs – Against All Defendants)**

429.    Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

430.    Plaintiffs are informed, believe, and thereupon allege that Defendants are trying to foreclose on Plaintiffs' properties via non-judicial sale even though Defendants do not have standing and have not demonstrated the proper chain of title to do so. Plaintiffs allege that Defendants have "securitized" their loans and are no longer the holder in due course. Defendants have converted Plaintiffs' NOTES and DEEDS OF TRUST into something completely different than what Plaintiffs originally signed. Plaintiffs allege that in order to foreclose, Defendants must be the holder in due

- 125 -

1  course, must be the holder of the original NOTES and DEEDS OF TRUST, or must at least have a chain

2  of title purporting that they have control of these instruments.  Plaintiffs allege that Defendants are not

3  themselves the owners, cannot (or are not willing to) point to a specific beneficiary of the loans and

4  therefore cannot claim that the mortgage payments are in default.

5      431.  Plaintiffs are informed, believe, and thereupon allege that Defendants have not complied

6  with foreclosure requirements of California Civil Code §2923.5, §2924, §2932.5 and therefore lack
standing to foreclose.

7      432.  Plaintiffs allege that for these reasons, as well as for the reasons stated above, that

8  Defendants should be estopped from foreclosing on Plaintiffs.

9      433.  As a proximate result of the misrepresentations by WELLS FARGO Defendants,

10  Plaintiffs have been threatened with the loss of their homes and their credit ratings have been

11  diminished.

12  **THIRTEENTH CAUSE OF ACTION**
**Breach of Implied Covenant and Good Faith Dealing**
**(By All Plaintiffs – Against All Defendants)**

13

14      434.  Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as

15  though fully set forth herein.

16      435.  Plaintiffs Farrah Pirahanchi, Monireh Bozorgi

17

18  allege that they

19  entered into a contract with the WELLS FARGO Defendants to modify their loans.

20      436.  Plaintiffs allege that in reliance of this offer, Plaintiffs entered into forbearance and/or

21  modification agreements with Defendants.  Plaintiffs were told that a permanent modification based on

22  the terms offered would be offered after they stopped paying the mortgage for a period of 3 or 6 months
and Defendants would not foreclose on the property.

23      437.  As set forth more fully above, Plaintiffs provided ample consideration to support this

24  contract in the exact same manner held sufficient by the Hon. William Alsup, District Judge, U.S.

25  District Court, Northern District of California, in *Ansanelli v. JPMorgan Chase*, 2011 WL 1134451,

26  - 126 -

27  **PLAINTIFFS' COMPLAINT FOR DAMAGES**

Case No. CV10-03892 WHA, which carefully analyzed the exact same type of contractual claims at issue here and eruditely held, in pertinent part as follows:

> Under California law, consideration exists even if the performance due "consists almost wholly of a performance that is already required and that this performance is the main object of the Promisor's desire. It is enough that some small additional performance is bargained for and given. . . . [It is sufficient] if the act or forbearance given or promised as consideration differs in any way from what was previously due." *House v. Lala*, 214 Cal. App. 2d 238, 243 (1963) (citations omitted). Furthermore, "consideration may be either a benefit conferred upon the promisor or a detriment suffered by the promise." *Asmus v. Pac. Bell*, 23 Cal. 4th 1, 31–32 (2000).

438.    Plaintiffs and Defendant made new promises which were separate and beyond the promises in the original contract. After Plaintiffs and Defendants allegedly reached an agreement that Plaintiffs' loans would be permanently modified if they complied with the trial period plan, Plaintiffs expended time and energy and made financial disclosures in furtherance of the agreement, which they were not required to under the original contract. Plaintiffs Farrah Pirahanchi, Monireh Bagdyi, ⎯⎯⎯⎯⎯⎯⎯⎯⎯ expended additional funds in furtherance of a modification which were not required under the original agreement.

439.    California law recognizes that a detriment constituting consideration includes such "expenditure of time and energy." *Raedeke*, 10 Cal. 3d at 673. Defendants also allegedly benefitted from the contract, in that Plaintiffs' performance made Defendants potentially eligible for incentive payments from the federal government for modifying loans. The alleged agreement thus provided benefits to Defendants and detriments to Plaintiffs beyond the preexisting mortgage agreement. Therefore, according to the allegations in the complaint and contrary to Defendant, there was more than a promise to perform a preexisting legal duty by Plaintiffs. Plaintiffs' payments and modification efforts constituted adequate consideration as described more fully above.

440.    The statute of frauds is no obstacle to Plaintiffs' recovery for several reasons. First, as noted by *Ansanelli,* supra, under identical circumstances, an exception applies here:

- 127 -

PLAINTIFFS' COMPLAINT FOR DAMAGES

Under California Civil Code Section 1698, "(b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties. [and] (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration." Based on this code section, "if there exists sufficient consideration for an oral modification agreement, then full performance by the promise alone would suffice to render the agreement 'executed' within the meaning of section 1698." *Raedeke v. Gibraltar Sav. And Loan Ass'n*, 10 Cal. 3d 665, 673 (1974).

441.   Plaintiffs allege that principles of quasi-contract and promissory estoppel apply here and will defeat any statute of frauds defense. The elements for promissory estoppel are (1) a promise that is clear and unambiguous in its terms (*Lange v. TIG Ins. Co.* (1998) 68 Cal. App. 4Th 1179, 1185); (2) breach of that promise (*Blatt v. University of S. Cal.* (1970) 5 Cal. App. 3D 935, 944); (3) actual reliance on the promise (*Van Hook v. Southern Cal. Waiters Alliance* (1958) 158 Cal. App. 2D 556); (4) that the reliance was both reasonable and foreseeable (*Graddon v. Knight* (1956)138 Cal. App. 2D 577); (5) detrimental reliance, i.e., injury from reliance on the promise (*Id.*); and (6) an injustice that can only be avoided by enforcement of the promise (*C & K Eng'g Contractors v. Amber Steel Co.* (1978) 23 Cal. 3D 1, 7).

442.   Plaintiffs allege that an injustice will ensue if Plaintiffs' oral agreement with Defendants is not enforced. *Drennan v. Star Paving Co.* held that a promise which the Promisor should reasonably expect to induce definite and substantial action or forbearance on the part of the promise or a third person, and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise. *Drennan v. Star Paving Co.*, (1958) 51 Cal. 2d 409, 413, 333 P.2d 757, 759.

443.   Plaintiffs allege that their claim should prevail because (1) Defendants made a promise that is clear and unambiguous in its terms (i.e., Defendants guaranteed loan modifications and promised Plaintiffs would not suffer harm to their credit or a foreclosure as long as they "strategically breached" by not paying for at least three to six months); (2) that promise was breached; (3) Plaintiffs actually relied on the promise; (4) Plaintiffs' reliance was both reasonable and foreseeable in light of the fiduciary and confidential relationship that Defendants created (see above); and (6) it is manifest that injustice can only be avoided by enforcement of the promise, e.g., inter alia, without equitable relief,

- 128 -

PLAINTIFFS' COMPLAINT FOR DAMAGES

1   Plaintiffs will lose their homes and all equity therein, which, in most cases, represents their entire life

2   savings. See, *C & K Eng'g Contractors v. Amber Steel Co.* (1978) 23 Cal. 3d 1, 7.

3        444.    Plaintiffs allege that the statute of frauds is not a valid defense because Defendants

4   intentionally induced Plaintiffs to rely on Defendants, Plaintiffs' justifiably relied on Defendants'

5   promises thereby causing unconscionable injury to Plaintiffs, and Defendants thereby unjustly enriched

   themselves by "stealing" Plaintiffs' homes. See, e.g., *Siam Numhong Prods. V. Eastimpex*, 866 F. Supp.

6   445, 448 (N.D. Cal. 1994) (promissory promises may act as exception to statute of frauds where promise

7   proves detrimental reliance and unconscionable injury); *Munoz v. Kaiser Steel Corp.*, 156 Cal. App. 3d

8   965, 974, 203 Cal. Rptr. 345, 350 (1984) (statute of frauds may be avoided upon showing of

9   unconscionable injury to plaintiff or unjust enrichment to defendant); *Crail v. Blakely*, 8 Cal. 3d 744,

10   752, 106 Cal. Rptr. 187, 193 (1973) (no statute of frauds defense where woman committed suicide

11   believing that her husband would honor their oral agreement to leave their combined estates to their

12   children); *Ruinello v. Murray*, 36 Cal. 2d 687, 689, 227 P.2d 251 (1951). Plaintiffs allege that, based on

13   the foregoing, this claim prevails.

14        445.    Plaintiffs allege that Defendants advised Plaintiffs to stop paying their mortgage to avail

15   themselves of the modification programs and induced Plaintiffs to believe that modification was an

16   alternative to foreclosure at the same time that Defendants were reporting Plaintiffs' default to credit

   agencies and proceeding with foreclosure. Plaintiffs allege that Defendants thereby severely impaired

17   Plaintiffs' ability to obtain consumer credit and home mortgage financing by alternative sources and

18   made it more likely that Plaintiffs would suffer foreclosure. Plaintiffs allege that Defendants made the

19   promise of loan modification without intending to modify Plaintiffs' loans, but to enhance their own

20   position regarding foreclosure, secure an unfair advantage over Plaintiffs, and proceed to foreclose and

21   take Plaintiffs' property for profit.

22        446.    Plaintiffs allege that despite Plaintiffs' efforts to explore foreclosure avoidance options

23   with the Defendants, the WELLS FARGO Defendants failed and refused to:

24                  i.   evaluate Plaintiffs' financial condition for foreclosure avoidance in good

                     faith;

25

26

   **PLAINTIFFS' COMPLAINT FOR DAMAGES**

27

ii. advise Plaintiffs of their statutory rights to meet with Defendants regarding such foreclosure avoidance; and

iii. advise Plaintiffs of the toll-free HUD phone number regarding counseling opportunities to avoid the subject foreclosure.

447. Plaintiffs further allege that at all times prior to Defendants filing a NOTICE OF DEFAULT, Plaintiffs were fully available to meet with Defendants or their authorized representatives to assess Plaintiffs' financial conditions and to discuss options for Plaintiffs to avoid foreclosure.

## FOURTEENTH CAUSE OF ACTION
### Institutional Bad Faith
**(By All Plaintiffs – Against All Defendants)**

448. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein at length.

449. Plaintiffs allege on information and belief that the WELLS FARGO Defendants committed institutional bad faith.

450. Defendants' institutional bad faith amounts to reprehensible conduct because the conduct is part of a repeated pattern of unfair practices – as fully set forth above – and not an isolated occurrence.

451. The pattern of unfair practices constitutes a conscious course of wrongful conduct that is firmly grounded in the established company of Defendants.

452. Plaintiffs are informed and believe and thereon allege that Defendants committed institutional bad faith by other acts and omissions of which they are presently unaware but which will be shown according to proof at the time of trial.

453. Defendants acted with actual malice by engaging in Institutional Bad Faith, failing to cure the same and concealing the magnitude of the problem.

454. Plaintiffs are entitled to exemplary and punitive damages in the sum according to proof and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

**FIFTEENTH CAUSE OF ACTION**
**WRONGFUL FORECLOSURE,**
**VIOLATION OF CAL. CIVIL CODE § 2924**
**(By PLAINTIFFS named below)**
**(against ALL DEFENDANTS and DOES 101 through 200)**

455.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

456.   Defendants have already foreclosed upon the following property owned by ANDRES BALCAZAR [4].

457.   Because Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

458.   The burden of proving an assignment falls upon the party asserting rights thereunder. In an action by an assignee to enforce an assigned right the evidence must not only be sufficient to establish the fact of assignment when that fact is in issue, but the measure of sufficiency requires that the evidence of assignment be clear and positive to protect an obligor from any further claim by the primary obligee. Defendants, they failed to do so and improperly foreclosed by reason of lack of proof that they had the right to proceed.

459.   Under the California *Uniform Commercial Code*, a negotiable instrument, such as a promissory note secured by a mortgage, may only be enforced by the holder or a person with the rights of a holder. (*Comm. Code* § 3-301.) For instruments payable to an identified person, such as a lender, a holder is generally recognized as the payee or one to whom the negotiable instrument has been negotiated. This requires transfer of possession and endorsement by the prior holder. (*Comm. Code* § 3-201.) Unless the parties otherwise provide, the mortgage follows the note. (*Civ. Code* § 2936.)

460.   Though in California, the assignment of a note generally carries with it an assignment of the mortgage (*Civ. Code* § 2936), it is still required in California that the holder of the note or a person operating with authority from that holder be the foreclosing party and that the mortgage not have been assigned away from that note.

461.   Defendants no longer own the notes originated by the enterprise and owners of plaintiffs' mortgages are unknown; Defendants do not know who owns these mortgages. Indeed, the

- 131 -
**PLAINTIFFS' COMPLAINT FOR DAMAGES**

1  Defendants do not know where it is that they obtained their alleged rights to collect money from

2  Plaintiffs thereunder.

3       462.    Once separated from the note, the trust deed is unenforceable and of no legal value. For

4  negotiable instruments payable to an identified person, such as a lender, a holder is generally recognized

5  as the payee or one to whom the negotiable instrument has been negotiated. This requires transfer of

  possession and endorsement by the prior holder. (*Comm. Code* § 3-201). Unless the parties otherwise

6  provide, the mortgage follows the note. (*Civ. Code* § 2936- "the assignment of a debt secured by

7  mortgage carries with it the security.")

8       463.    Defendants have no evidence that they own the notes or have any power to enforce them

9  from the rightful owners.

10       464.    As described above, there is compelling evidence that Defendants are violating TILA

11  and the Patriot Act by failing to provide required information as to the owners of the notes and deeds of

12  trust and the sources of funds used to provide their mortgages and/or acquire their mortgages.

13       465.    Foreclosure by Defendants is wrongful for each of the following reasons or all of them:

14

15      a.   because Plaintiff's mortgage was obtained through concealment and/or
        misrepresentation;

16      b.   because Defendants do not own the note and do not have a power of attorney with

17          respect to the note;
    c.   because the note and deed of trust have become separated;

18      d.   because Defendants do not own the deed of trust and do not have a power of attorney

19          with respect to the deed of trust;

20      e.   because Defendants cannot surmount their burden of demonstrating they own the
        note or have a power of attorney with respect thereto; and

21      f.   because Defendants cannot surmount their burden of demonstrating they own the

22          deed of trust or have a power of attorney with respect thereto.

23

24       466.    As a result of Defendants' wrongful foreclosures, each Plaintiff herein was dispossessed

25  of their property and put to the expense of relocating and securing alternative properties. Plaintiffs were

26  further dispossessed of the value of Plaintiffs real property and the potential appreciation thereof.

27  **PLAINTIFFS' COMPLAINT FOR DAMAGES**

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. General, special and exemplary damages according to proof under the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Causes of Action;

2. Statutory relief according to proof under the Sixth and Seventh Causes of Action;

3. Temporary, preliminary, and permanent injunctive relief under the Fifth, Ninth and Tenth Causes of Action;

4. On all Causes of Action, for costs of suit herein;

5. On all Causes of Action, for pre- and post-judgment interest;

6. On all Causes of Action for which attorney's fees may be awarded pursuant to the governing contact, by statute or otherwise, reasonable attorney's fees; and

7. On all Causes of Action, for such other and further relief as this Court may deem just and proper, provided that this Complaint, including, without limitation, this prayer for relief shall be conformed to effect the Plaintiffs' averment and intention that fewer than 100 plaintiffs are alleging claims or amounts in controversy that would, as to them, equal or exceed the jurisdictional amount for federal jurisdictional under 28 U.S.C. § 1332(a).

DATED:   7/18/18

FARRAH PIRAHANCHI, NAZEMI
Monireh Bozorgi

_(signature)_
Bozorgi

- 133 -

**PLAINTIFFS' COMPLAINT FOR DAMAGES**